561 F.2d 434
 1977-2 Trade Cases 61,568
 Paul J. BOGOSIAN, on behalf of himself and all those
similarly situated, Appellant,
v.
GULF OIL CORPORATION, American Oil Company, Humble Oil &
Refining Company, Mobil Oil Company, Phillips Petroleum
Company, Shell Oil Company, Sun Oil Company, Texaco, Inc.,
Cities Service Oil Company, Atlantic Richfield Company,
Union Oil Company of California, Union 76 Division, Amerada
Hess Corp., Hess Oil and Petroleum Division, Getty Oil
Company, Standard Oil Company of Ohio, Standard Oil Company
of California.
Louis J. PARISI, on behalf of himself and all others
similarly situated, Appellant,
v.
GULF OIL CORPORATION, American Oil Company, Exxon
Corporation, Mobil Oil Company, Phillips Petroleum Company,
Shell Oil Company, Sun Oil Company, Texaco, Inc., Cities
Service Oil Company, Atlantic Richfield Company, Union Oil
Company of California, Union 76 Division, Amerada Hess
Corp., Hess Oil and Petroleum Division, Getty Oil Company,
Standard Oil Company of Ohio, Standard Oil Company of
California, Chevron Oil Co.
 Nos. 75-1666, 75-1833, 75-1667 and 75-1834.
 United States Court of Appeals,
Third Circuit.
 Argued March 28, 1977.
Decided July 21, 1977.
 
 David Berger, Warren D. Mulloy, Bruce K. Cohen, Warren Rubin, Steven M. Kramer, David Berger, P. A., Philadelphia, Pa., Harold Brown, Brown & Leighton, Boston, Mass., Norman P. Zarwin, Zarwin, Baum, Arrangio & Somerson, Philadelphia, Pa., for appellants, Paul J. Bogosian and Louis J. Parisi.
 Frank W. Morgan, Pittsburgh, Pa., Hoyt A. Harmon, Jr., Bala-Cynwyd, Pa., for Gulf Oil Corp.
 Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for American Oil Co.
 Benjamin M. Quigg, Jr., Stephen W. Armstrong, Morgan, Lewis & Bockius, Philadelphia, Pa., Robert L. Norris, Houston, Tex., for Exxon Corp.
 Charles F. Rice, James L. Burton, New York City, for Mobil Oil Corp.
 Ralph W. Brenner, David L. Grove, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Lewis J. Ottaviani, Bartlesville, Okl., for Phillips Petroleum Co.
 John T. Clary, Philadelphia, Pa., William Simon, William R. O'Brien, Robert J. Brookhiser, Howrey & Simon, Washington, D. C., for Shell Oil Co.
 John G. Harkins, Jr., Barbara W. Mather, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Robert M. Dubbs, St. Davids, Pa., for Sun Oil Co.
 Henry T. Reath, Duane, Morris & Heckscher, Philadelphia, Pa., Milton Handler, Milton J. Schubin, Kaye, Scholer, Fierman, Hays & Handler, New York City, for Texaco, Inc.
 Edward W. Mullinix, Arthur H. Kahn, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for The Standard Oil Co. (Ohio).
 Moses Lasky, Richard S. Haas, Brobeck, Phleger & Harrison, San Francisco, Cal., Edward W. Mullinix, Arthur H. Kahn, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Union Oil Co. of California.
 H. Francis DeLone, Richard G. Schneider, Dechert, Price & Rhoads, Philadelphia, Pa., C. Lansing Hays, Jr., Hays, Landsman & Head, New York City, for Getty Oil Co.
 Robert W. Sayre, Frederick H. Ehmann, Jr., Saul, Ewing, Remick & Saul, Philadelphia, Pa., William E. Jackson, Milbank, Tweed, Hadley & McCloy, New York City, for Amerada Hess Corp.
 Allen F. Maulsby, Cravath, Swaine & Moore, New York City, George P. Williams, III, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Chevron Oil Co.
 OPINION OF THE COURT
 Before SEITZ, Chief Judge, ALDISERT and GIBBONS, Circuit Judges.
 SEITZ, Chief Judge.
 
 
 1
 In separate lawsuits, two independent service station dealers, Bogosian and Parisi, sued their respective lessors, Gulf and Exxon, alleging that the lease contracts imposed a tie-in in violation of § 1 of the Sherman Act. Each plaintiff also joined as party defendants fourteen other major oil companies whom they alleged, together with Gulf and Exxon, engaged in what they now argue was concerted action to unlawfully tie the leasing and subleasing of gas station sites to the purchase of gasoline supplied by each dealer's lessor. More specifically, plaintiffs alleged that, at least since 1957, and continuing to the present, "defendants, through a course of interdependent consciously parallel action, have required all dealers who lease, sublease, or renew such leases or subleases for one or more of defendants' service stations to:
 
 
 2
 (a) license the use of the lessor's trademark;
 
 
 3
 (b) sell only the lessor's gasoline; and
 
 
 4
 (c) not sell gasoline purchased from any other source under the licensed trademark."
 
 
 5
 Plaintiffs alleged that these restrictions forced them to buy gasoline at whatever price their lessor offered and prevented them from selling other brands of gasoline. They sought to maintain the suit on behalf of all present and former lessee gasoline dealers of the defendants.
 
 
 6
 After substantial discovery limited to the class action allegations, the district court refused to certify the class (62 F.R.D. 124, E.D.Pa.1973), and under 28 U.S.C. § 1292(b) certified as immediately appealable its order denying class action status. This court refused petitioners' application to appeal pursuant to § 1292(b). (Misc. Record No. 76-8087, April 17, 1974). In April, June and July of 1975 the district court granted motions for summary judgment made by all moving defendants which had had no business dealings with the named plaintiffs (non-lessor defendants), but refused the motions as to the lessors of the named plaintiffs. 393 F.Supp. 1046 (E.D.Pa.1975). Prior to the grant of the motions no discovery had been taken on the issue of concerted action. Although plaintiffs moved for discovery under Fed.R.Civ.P. 56(f),[1] the court held that "(b)ecause the complaint fails, as a matter of law, to state a cause of action under the Sherman Act § 1 against (nonlessor defendants), summary judgment will be granted and plaintiffs' Rule 56(f) motion will be denied." (footnote omitted). The court granted the summary judgment motion because it concluded that the allegation of "interdependent consciously parallel action" in a complaint is an insufficient statement of the concerted action necessary to state a claim under § 1.
 
 
 7
 All of the orders granting summary judgment contained an express determination that, pursuant to Fed.R.Civ.P. 54(b), there is no just reason to delay and expressly directing entry of final judgment, although the actions were not wholly terminated by the orders. Subsequently, the district court filed a supplementary opinion expressing the reasons for its 54(b) determination. Plaintiffs timely appealed and defendants moved to dismiss the appeals contending that the entry of judgment was an abuse of discretion and should be vacated.
 
 I. APPEALABILITY
 A. Finality
 
 8
 Behind Rule 54(b) is the recognition that with the liberal joinder of claims and parties now permitted by the federal rules, the policy against piecemeal review implicit in the "single judicial unit" rule must be weighed against the untoward effects which can occur when decisions final as to some claims and some parties cannot be entered until the litigation is final as to all claims and all parties. The district court is not empowered to enter judgment on a decision which is not final. However, by determining that a final decision which terminates the action as to one or more but fewer than all parties or as to one or more but fewer than all claims is an appropriate judicial unit, the court can dispatch for appeal decisions which otherwise would not then be appealable because of the "single judicial unit" rule. Wetzel v. Liberty Mutual Insurance Co., 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976); Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 76 S.Ct. 895, 100 L.Ed. 1297 (1957). The threshold issue, therefore, is whether the order appealed from finally resolved at least one entire claim, leaving at least one separate claim unresolved or alternatively whether the order finally determined the rights and liabilities of at least one party leaving at least one other party whose rights or liability remains undetermined.
 
 
 9
 Determination of whether multiple parties are involved within the meaning of the rule is not difficult. Prior to the 1961 amendment it was thought that a complaint charging an antitrust conspiracy against several defendants stated only one claim and dismissal of the complaint as to fewer than all defendants was not appealable under Rule 54(b). E. g., Steiner v. 20th Century-Fox Film Corp., 220 F.2d 105 (9th Cir. 1955). The 1961 amendment was intended to change this result. See Advisory Committee Note to 1961 amended 54(b). In view of the purpose of the amendment, it is clear that even if the complaint states only one claim, the district court is empowered to enter judgment upon an order terminating the action as to one or more but fewer than all parties. See 6 J. Moore, Federal Practice Para. 54.34 (2.-2). (2d ed. 1948).
 
 
 10
 The district court granted summary judgment and directed the immediate entry of judgment for all moving defendants except Gulf and Atlantic Richfield in 393 F.Supp. 1046 (Bogosian ) and to all moving defendants except Exxon and Atlantic Richfield in 393 F.Supp. 1046 (Parisi ); the motions for summary judgment filed by Atlantic Richfield on August 6, 1975 were denied without prejudice because they were made after plaintiffs had filed their notices of appeal. Cities Service Oil Company, a defendant in both cases, has not moved for summary judgment. Therefore, Cities Service and Atlantic Richfield remain as defendants in both cases and are not before the court on appeal. In entering judgment in favor of those defendants on this appeal other than Gulf and Exxon, the court clearly acted within its power since those defendants have been wholly terminated from both actions.
 
 
 11
 On the other hand, although Gulf has been wholly terminated in Parisi, it remains as a defendant in Bogosian, while Exxon, which is no longer a defendant in Bogosian, remains as a defendant in Parisi. If the rights and liabilities of Gulf and Exxon have not been wholly terminated then, assuming arguendo that the complaint states a single claim, the district court properly could not enter judgment for them and plaintiffs could not maintain this appeal as to them. Compare Backus Plywood Corp. v. Commercial Decal, Inc., 317 F.2d 339 (2d Cir.), cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963), with 6 Moore, supra, Para. 54.34 (2.-2) at 564.
 
 
 12
 If we were to view the suit brought by Parisi and that by Bogosian as a single unit, it would follow that judgment could not have been entered for Gulf because a live claim is pending against it in Parisi, nor for Exxon because a live claim is pending against it in Bogosian. The factors which militate toward this view are that both plaintiffs are represented by the same attorney, the suits are filed in the same forum, are before the same judge, and the complaints and the defendants are identical. On the other hand, the cases have not been consolidated for trial. It is therefore possible that the cases could be scheduled for trial at different times and be tried before different juries. The existence of this possibility strongly favors the construction that each civil action be regarded as a separate judicial unit for Rule 54(b) purposes. By its terms the rule is applicable when multiple claims or multiple parties are presented "in an action." We hold, therefore, that, at least absent consolidation for all purposes of cases separately filed, each civil action is to be viewed as a separate unit. Since the order granting summary judgment for Gulf in Parisi and for Exxon in Bogosian wholly terminated the defendants respectively from those cases, the court was empowered to enter judgment upon the orders. We need not consider, therefore, whether the allegations of the complaint state a single or multiple claim for Rule 54(b) purposes.
 
 B. Abuse of Discretion
 
 13
 Once it is determined that the district court was empowered to enter final judgment under 54(b), its decision to do so can be set aside only for an abuse of discretion. Mackey, supra, 351 U.S. at 437, 76 S.Ct. 895. We have previously indicated that " . . . ordinarily an application for a 54(b) order requires the trial judge to exercise considered discretion, weighing the overall policy against piecemeal appeals against whatever exigencies the case at hand may present. . . ." Panichella v. Pennsylvania RR., 252 F.2d 452, 455 (3d Cir. 1958).
 
 
 14
 In this case we have the benefit of the district court's opinion explaining the basis for its particular exercise of discretion. We do not necessarily agree with all of the reasons proffered by the district court. We discuss only those which are important to our conclusion that its order was consistent with the sound exercise of discretion:
 
 
 15
 (1) No disposition of the pending claim which the district court might make could moot the issues presented by the appeal of the conspiracy claim.
 
 
 16
 (2) The questions presented by the appeal are not before the district court as to the defendants against whom live claims are pending.
 
 
 17
 We think that the question before us could be mooted by a disposition of the pending claim in the district court. As defendants argued, a resolution of the tie-in claim in favor of the lessor defendants will moot the "conspiracy claim."[2] In each complaint plaintiffs allege that certain provisions contained in the lease agreements between themselves and their lessors constitute an unlawful tying arrangement. They further allege that each defendant, through concerted action, imposed the same unlawful tying arrangement on its lessees. Thus, if after trial and appeal, the contractual arrangements in issue on the pending claims against the lessors were found not to amount to an unlawful tying arrangement, plaintiffs would be collaterally estopped from relitigating the lawfulness of the same contractual arrangements against the remaining defendants.[3]
 
 
 18
 Defendants also contend that a district court decision in favor of plaintiffs would moot the claim involved in this appeal. They argue that plaintiffs can recover the full amount of their damages from the lessor defendants obviating the need to litigate against the nonlessor defendants. We cannot accept this reasoning. We know of no principle of law which would preclude suit by plaintiffs against alleged co-conspirators of defendants against whom a judgment has been obtained. The purpose of the antitrust laws would be ill-served if defendants implicated in a broad based unlawful conspiracy could avoid trial simply by pointing to the possibility of plaintiffs obtaining full monetary relief against other defendants in a related antitrust action. Moreover, eliminating the 13 nonlessor defendants from trial would preclude plaintiffs and the class from obtaining the injunctive relief sought against those defendants.
 
 
 19
 The second point we question is whether the issues before us on this appeal may again require attention by this court on a subsequent appeal. As we have indicated, two of the 15 defendants, Atlantic Richfield and Cities Service are not now before this court. A decision by this court in favor of plaintiffs on any issue would not bind the absent defendants. Nevertheless, if in that situation the district court were to decide either the summary judgment motion or class action issue against the absent defendants in a manner consistent with our decision as to the other defendants, the absent defendants could appeal that decision at the appropriate time, forcing us to consider these issues again. While we agree that such is the law, we do not agree that such an eventuality necessarily makes it inappropriate to enter final judgment without delay.
 
 
 20
 We have noted that with the advent of the 1961 amendment it is now possible in appropriate cases to enter final judgment as to some but fewer than all parties even though a single claim is involved. In that situation, it would be clear that the court of appeals might be forced to consider the same claim again as to the parties against whom no judgment had been entered at the time of the appeal. Thus, we conclude that that fact alone cannot make it inappropriate to enter final judgment as to some but fewer than all parties.
 
 
 21
 We have the benefit on this appeal of the joint brief of 13 defendants, 11 of whom are nonlessors with whom Atlantic Richfield and Cities Service are similarly situated. Although our mandate will not bind the absent defendants, we recognize, nevertheless, that the operation of stare decisis is unlikely to make full reconsideration of the issues decided on this appeal unlikely if and when those issues are tendered on a subsequent appeal.[4] We conclude, therefore, that the fact that absent defendants might on a subsequent appeal raise issues which must now be considered if the entry of judgment under 54(b) stands, is not a significant factor in this case.
 
 
 22
 In sum, the district court was faced with a complex antitrust case stating two theories, a conspiracy-tying allegation resolution of which was final as to 13 defendants, and a contract-tying allegation which was pending trial and involved two defendants. There is a possibility that decision on the contract theory pending trial could moot the question presented on the appeal from the conspiracy-tying theory. Nevertheless, a decision on that claim might take a number of years to reach, and, in the interim, the defendants would bear the uncertainty arising from the fact that they may be forced to defend a massive antitrust claim years in the future. More importantly, an appellate decision reversing the entry of summary judgment on the conspiracy-tying claim might necessitate a second trial, at least part of which would involve proof of the same alleged tying arrangement involved in the trial of the contract-tying theory. Moreover, because the summary judgment was granted on the basis of the pleadings, our need to examine the record at this stage is minimal. We will thus not be twice forced to master the complex factual situation underlying the claims of the existence of a conspiracy and the validity of the alleged tying arrangements.
 
 
 23
 The immediate entry of final judgment will promote a unified disposition of the substantive tying claims presented here as to all defendants without significantly delaying the disposition as to the two lessor defendants and without causing duplication of effort by this court. These matters lie at the heart of the tension between the conflicting policies inherent in Rule 54(b). We find no abuse of discretion in the district court's implicit determination that the policy against piecemeal review was not unduly frustrated by immediately entering these judgments.
 
 
 24
 Defendants contend that assuming that the entry of judgment under Rule 54(b) was proper, there is no jurisdictional basis to appeal the earlier order of the district court denying class action certification. They argue that if we were to reverse the summary judgments, the issue would be moot, while if we affirm, the case merely reverts to the status ante. It is anomalous, they suggest, that our prior refusal to entertain the class action issue under 28 U.S.C. § 1292(b) should suddenly be reversed when the conspiracy-tying claim is appealed under Rule 54(b).
 
 
 25
 Defendants' argument fails to take cognizance of Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239, 245 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), which decided this precise issue. As Wetzel indicates, defendants' argument fails to note the distinction between 28 U.S.C. § 1292(b) and Rule 54(b). A district court is not empowered to certify issues for appeal under Rule 54(b) but only to enter judgment without delay on decisions which are final under 28 U.S.C. § 1291. It is axiomatic that an appeal taken from a judgment entered under 54(b) brings to the court of appeals all issues determined in the district court which would be reviewable on an appeal from any final judgment.
 
 II. SUMMARY JUDGMENT
 A. Standard of Review
 
 26
 Plaintiffs contend that notwithstanding that the district court styled its order as one granting summary judgment, the order should be reviewed as one granting a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. "It is a familiar principle that the label (which) a district court puts on its disposition of a case is not binding on a Court of Appeals." Tuley v. Heyd, 482 F.2d 590, 593 (5th Cir. 1973). We therefore look to the course of proceedings and basis for decision in the district court to evaluate plaintiffs' contention.
 
 
 27
 At the time the motions for summary judgment were made, discovery had been undertaken which was principally concerned with the issues raised by the class action allegations. Generally speaking the motions were grounded on two theories. The first was that as to the nonlessor defendants, plaintiffs lacked standing under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This argument was based upon plaintiffs' depositions in which they severally stated that the nonlessor defendants had not damaged them in their business or property and that they had no knowledge of a conspiracy among the defendants. The second theory was that the complaints failed to allege concerted action sufficient to state a claim under section 1 of the Sherman Act. Plaintiffs moved for denial of the motions under Rule 56(f), submitting the required affidavit and saying that plaintiffs were unable properly to respond to the motions without an opportunity to conduct discovery concerning the "conspiracy" claim.
 
 
 28
 The district court held that "(because) the complaint fails, as a matter of law, to state a cause of action under Sherman Act § 1 against (the nonlessor defendants), summary judgment will be granted and plaintiffs' Rule 56(f) motion will be denied." 393 F.Supp. at 1049 (footnote omitted). The district court rejected the nonlessors' standing argument as a basis for summary judgment, ruling that plaintiffs' deposition testimony was inconclusive.
 
 
 29
 It is clear from the district court's opinion that it excluded everything but the complaint in granting the motions. Moreover, the record before us shows that the discovery which had been taken was directed solely toward the class action issues. The memorandum in support of plaintiffs' Rule 56(f) motion indicated that the evidence which would support its theory of a combination or conspiracy was, as it usually is in such cases, in the hands of defendants and that summary judgment should not be granted without affording plaintiffs an opportunity for discovery on the issue of concerted action. " (W)e have said that where the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course." Costlow v. United States, 552 F.2d 560, at 564 (3d Cir. 1977), citing Ward v. United States, 471 F.2d 667, 670-71 (3d Cir. 1973). The district court regarded discovery as irrelevant, however, because it based its decision solely on the complaint which it thought failed to state a claim as a matter of law.
 
 
 30
 The district court could dismiss for failure to state a claim upon motion for summary judgment, but a motion so decided is functionally equivalent to a motion to dismiss. Schwartz v. Compagnie General Transatlantique, 405 F.2d 270, 273 (2d Cir. 1968); Moore, supra, Para. 56.02(3), at 2035. We therefore think it appropriate to review the order as we would one dismissing the complaint with prejudice for failure to state a claim. E. g. Tuley v. Heyd, supra, 482 F.2d at 593-94; Marvasi v. Shorty, 70 F.R.D. 14, 17 (E.D.Pa.1976); see Grzelak v. Calumet Publishing Co., Inc., 543 F.2d 579, 583 (7th Cir. 1975).
 
 
 31
 The standards by which the orders must be tested is whether taking the allegations of the complaint as true, Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), and viewing them liberally giving plaintiffs the benefit of all inferences which fairly may be drawn therefrom, see Murray v. City of Milford, 380 F.2d 468, 470 (2d Cir. 1967), "it appears beyond doubt that the plaintiff(s) can prove no set of facts in support of (their) claim which would entitle (them) to relief." Hospital Building Co. v. Trustees of Rex College, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).
 
 B. Sufficiency of the Complaint
 
 32
 The first amended Bogosian complaint made a number of allegations of unlawful practices which it alleged were accomplished by a "conspiracy" among defendants "through a course of interdependent consciously parallel action pursuant to a tacit understanding by acquiescence coupled with assistance . . ." The second amended complaint eliminated all allegations of unlawful practices except for the tying claims which we have discussed supra. Conspicuously absent as well is any reference to a conspiracy. Instead the second amended complaint makes the following reference to concerted action:
 
 
 33
 "13. For many years past, the exact date being presently unknown to plaintiffs, but at least as early as 1957, and continuing to the present, defendants, through a course of interdependent consciously parallel action, have required all dealers who lease . . ."
 
 
 34
 "14. The leasing practices of the defendants, individually and collectively, through interdependent consciously parallel actions, as aforesaid, including the use of short-term leases, leases based on contracts for the sale of lessor's brand of gasoline, and other contractual arrangements, have enabled the defendants to compel the lessee-dealers to purchase the lessor's brand of gasoline and not to purchase any other brand of gasoline for resale.
 
 
 35
 "16. The unlawful acts of defendants as aforesaid constitute an unreasonable combination in restraint of interstate trade and commerce in the marketing of gasoline in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.
 
 
 36
 "17. By means of their unlawful acts and pursuant to and in furtherance of the above-described combination, the defendants have in substantial measure succeeded in jointly accomplishing the following:
 
 
 37
 "19. As a result of the defendants' unlawful combination, plaintiff and the members of the class have suffered, and unless defendants are enjoined, will continue to suffer irreparable harm . . ."
 
 
 38
 The district court held that the complaint failed to allege either a "contract or conspiracy," and that the allegation of "interdependent consciously parallel action" did not plead the concerted action required to state a claim under § 1. Although the court recognized that, together with other evidence, consciously parallel business behavior may support an inference of conspiracy, it thought that an allegation of contract, conspiracy or combination is essential to state a claim. The court regarded the omission of the word "conspiracy" for the complaint to be a "deliberately employed strategy" by "experienced and learned attorneys in the field of antitrust litigation." Thus, it reasoned that although it terminated plaintiffs' actions for failure to plead the word "conspiracy" it was not resurrecting the requirement of pleading "magic words" which characterized common law pleading.
 
 
 39
 Plaintiffs argue that the complaint fairly read as a whole alleges a "combination," and that such an allegation combined with a statement of the specific course of conduct alleged to be unlawful clearly states a claim. We agree.
 
 
 40
 Paragraphs 16, 17, and 19 of the second amended complaint (hereinafter complaint), quoted supra, expressly refer to an unlawful combination. It is unnecessary to restate defendants' linguistic arguments to the effect that the word "combination" was not used to refer to an actual combination. Suffice it to say that their acceptance would hardly be consistent with the precept that the complaint be liberally construed.
 
 
 41
 Even if we had no doubt that plaintiffs' substitution of "combination" for "conspiracy" was deliberate and purposeful, we would be unwilling to speculate at this stage as to plaintiffs' theory. Plaintiffs' complaint alleges an unlawful combination and their briefs have not sought to explain that allegation in terms other than that of a classic combination or conspiracy. We perceive no distinction between the terms combination and conspiracy which would distinguish the two complaints. Our reading of § 1 cases indicates that the two terms are used interchangeably. As one commentator has noted, the cases have interpreted the statute as "present(ing) a single concept about common action, not three separate ones: 'contract . . . combination or conspiracy' becomes an alliterative compound noun, roughly translated to mean 'concerted action.' There is little need to grapple with issues about the meanings of the particular words of the statute nor to mark nice distinctions among them." L. Sullivan, Law of Antitrust 312 (1977). We therefore consider the sufficiency of a complaint which fairly read alleges a combination or conspiracy based upon interdependent consciously parallel action among defendants to impose allegedly unlawful tie-in agreements upon defendants' respective lessees.
 
 
 42
 The law is settled that proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of rational, independent choice less attractive than that of concerted action. Compare Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), with First National Bank v. Cities Service Co., 391 U.S. 253, 274-88, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). We recently articulated those circumstances in Venzie Corp. v. United States Mineral Products, Co., 521 F.2d 1309 (3d Cir. 1975):
 
 
 43
 "(1) a showing of acts by defendants in contradiction of their own economic interests . . .; and
 
 
 44
 "(2) satisfactory demonstration of a motivation to enter an agreement . . ."
 
 
 45
 Id. at 1314 (citations omitted).
 
 
 46
 Plaintiffs argue that, given an opportunity to conduct discovery, they will prove that both of these circumstances are present. They contend that independent self interest would indicate that each oil company seek to market gasoline to their competitors' lessees, and that the failure to so compete can be explained only by a mutual understanding, tacit or expressed, that gasoline be marketed to lessee-dealers on an exclusive basis. The motivation to participate in such an agreement, of course, is the elimination of price competition among oil companies at the wholesale level. We need not, at this time, consider whether this theory would necessarily carry the day, for we are satisfied that, at the least, it does not appear to a certainty that plaintiffs can prove no set of facts which under Venzie would entitle them to reach the jury.
 
 
 47
 Defendants argue nevertheless, and the district court held, that the failure to allege an agreement is fatal to plaintiffs' claim. We think that this position is based upon a misunderstanding of the limited role of the complaint in federal practice. It is not necessary to plead evidence, nor is it necessary to plead the facts upon which the claim is based. "To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).
 
 
 48
 The detailed statement of parallel lease provisions contained in plaintiffs' complaint which are alleged to be the product of an unlawful combination clearly meets these requirements. It was not necessary for plaintiffs to plead the basis upon which that combination will be proven. The goals of efficient judicial administration are retarded, not advanced, when the pleadings are used as a battleground for legal skirmishes without the necessary factual development upon which to focus decision. Clark, Special Pleading in the "Big Case," 21 F.R.D. 45 (1957). We think it was error to conclude that the complaint failed to state a claim under Section 1.
 
 
 49
 Plaintiffs also contend that even if their complaints are construed not to allege a combination, that an allegation of interdependent consciously parallel action states a § 1 claim. Neither plaintiffs nor defendants offer a definition of interdependence, however. A situation of interdependence has been said to exist when, in a highly concentrated market, there is an awareness that, because of the limited number of sellers, any variation in price or price-related structures will necessarily have a demonstrable effect on the sales of others such that each firm bases its decisions, at least in part, on the anticipated reactions of the others to its initiative. See Sullivan, supra, § 116.
 
 
 50
 There is a lively debate, however, concerning the relationship of interdependence to collusion. On the one hand, Professor Posner, for example, has said that interdependence cannot occur without, and hence is a product of, collusion. See Posner, Oligopoly and the Antitrust Laws: A Suggested Approach, 21 Stan.L.Rev. 1562-76; 1591-92 (1969). On the other hand, Professor Sullivan has said that interdependence can exist apart from collusion, but that noncollusive interdependent activity can, under certain circumstances, amount to an unlawful combination. Sullivan, supra § 122; See Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 660-81 (1962).
 
 
 51
 If these theories are to be tested, it should be done on a fully developed factual record which probes the conflicting economic facts on which they are premised. The complaint is much too blunt an instrument with which to forge fundamental policies regarding the meaning of competition in concentrated industries. Cf. White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). We conclude that the ruling that the specific allegation of interdependent consciously parallel action made here fails to state a claim should be vacated so that the issue can be decided, if necessary, after the relevant facts are fully developed.
 
 C. Standing Under §§ 4 and 16
 
 52
 In their motions for summary judgment and on appeal, defendants argued that plaintiffs lacked standing under §§ 4 and 16 of the Clayton Act[5] to challenge the practices of those defendants with whom they had no business dealings. Although the district court rejected this position, if we were to accept it, we would be required to affirm the grant of summary judgment.[6] See California Bankers Association v. Shultz, 416 U.S. 21, 71, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); Jurinko v. Edwin L. Wiegand Co.,477 F.2d 1038, 1045 (3d Cir.), vacated on other grounds, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973).
 
 
 53
 The gravamen of the complaints is that defendants jointly imposed a system of lease arrangements which eliminated wholesale price competition among defendants on sales to independent dealer lessees. The fact that each plaintiff and class member had direct business dealings with only one defendant is not dispositive, for plaintiffs allege that it was the joint participation of all defendants in the unlawful scheme which made possible the charging of supracompetitive prices to each dealer by his supplier. Thus, this case is similar to one in which defendants conspire to fix prices in sales to their customers. The fact that a customer has not made purchases from every co-conspirator does not prevent him from suing all for each co-conspirator contributed to the charging of the supracompetitive price paid by the purchaser.
 
 
 54
 Plaintiffs allege that the purpose and effect of the tie-in practice is to eliminate wholesale competition thus affecting the price and other conditions surrounding their purchase of gasoline. The injury of which they complain is the immediate, direct and proximate consequence of defendants' actions. Since the unlawful practices of which plaintiffs complain were imposed directly upon them, they are the logical suitors to vindicate the antitrust laws.
 
 
 55
 Defendants argue that the deposition testimony of Bogosian and Parisi establishes that neither has any claim against nonlessor defendants, that neither attempted to purchase gasoline from any defendant other than his lessor, and that neither made a claim of concerted action by his lessor with the other defendants.
 
 
 56
 The record indicates that the reason plaintiffs did not seek to purchase gasoline from other oil companies was not their lack of desire to do so, but that they feared termination of their leaseholds if such an attempt were made, or that such an attempt would be futile. We also reject the argument that an antitrust plaintiff's statement that he was not injured by alleged co-conspirators demonstrates his lack of standing as to them. As the district court noted, "plaintiffs would not be expected to understand the legal ramifications or even be aware of the activities of the defendants which may have injured them." 393 F.Supp. at 1050 n.7. Plaintiffs might not even be fully aware of the economic impact of a broad based conspiracy on the structure of the industry and of the complex of economic forces flowing from it which might adversely affect their businesses. We hold that the district court correctly concluded that there is no basis in this record for granting summary judgment on the ground of lack of standing.
 
 III. REFUSAL TO CERTIFY UNDER 23(b)(3)
 
 57
 Before certifying a class under Rule 23(b)(3), the district court must determine that the four prerequisites contained in 23(a) are satisfied, "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Before making its finding on predominance, the court must, of course, identify the issues involved in the lawsuit and which are common, and before making its finding on the superiority of the class action device, it must apply the fairness and efficiency criteria contained in the rule.
 
 
 58
 In Katz v. Carte Blanche Corp., 496 F.2d 747, 756-57 (3d Cir. 1974) (in banc ), we articulated the standard of review applicable to class action decisions. We must decide whether the 23(a) prerequisites have been met, whether the district court correctly identified the issues involved and which are common, and whether it properly identified the comparative fairness and efficiency criteria. If the court's analysis on these points is correct, then, "it is fair to say that we will ordinarily defer to its exercise of discretion" embodied in the findings on predominance and superiority. Id.
 
 
 59
 A. Prerequisites to Maintaining Class Action
 
 
 60
 Although the district court did not discuss the prerequisites expressly, the structure of its opinion leads us to believe that it regarded them as having been met. Based upon our independent review of the record we conclude that all have been satisfied. We discuss each briefly:
 
 
 61
 (1) Numerosity. Estimates of the number of class members have varied between 100,000 to 2 million, but it is conceded by all parties that the numerosity requirement has been met. (2) Common Questions. It is also clear that there are at least some issues of both fact and law which are common to the class as our discussion in the next section illustrates. (3) Representative claims typical. The claims pressed by the representatives are identical to those which they press on behalf of the class generally. Beyond this general observation there appears to be nothing which would fall under this rubric which is not also covered by one of the other subsections. See 3B J. Moore, Federal Practice, Para. 23.06-2 (2d ed. 1948). (4) Adequacy of Representation. This prerequisite embodies concerns which fall into two categories: that the representatives and their attorneys will competently, responsibly and vigorously prosecute the suit, and that the relationship of the representative parties' interests to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit. See Mersay v. First Republic Corp. of America, 43 F.R.D. 465, 469 (S.D.N.Y.1968); 3B Moore, supra Para. 23.07. We see no problem concerning the first aspect. The district court has described counsel for plaintiffs as "experienced and learned attorneys in the field of antitrust litigation." 393 F.Supp. at 1048 n. 5. With regard to the second, however, the district court was concerned that the potential may develop for a divergence of interests between former and present lessees. In that situation the adequacy of the representation of the named representatives, neither of whom is a former lessee of a defendant who is not also a present lessee of a defendant, might be questioned.[7] Nevertheless, as the district court recognized, it is equipped by Rule 23(d) to deal with this situation by a variety of means, including certification of subclasses, if and when its concerns ripen. In short, on this record, there is no basis to deny class certification on the basis of inadequacy of representation.
 
 B. Identification of Common Questions
 1. The Elements of A Tying Violation
 
 62
 * The elements of a Sherman Act § 1 tying violation are well settled. As we indicated in Ungar v. Dunkin' Donuts of America, Inc., 531 F.2d 1211 (3d Cir. 1976), a per se violation is established when plaintiff proves three elements: the existence of a tie, "that the seller has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product," and "that a 'not insubstantial amount of interstate commerce is affected.' "[8] Id. at 1223-24 quoting Northern Pacific Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).
 
 
 63
 Relying upon Ungar, defendants appear to argue that coercion is a requirement of proof in all tying cases. Neither Ungar nor any other case has so held. Rather, Ungar affirmed that under a long line of Supreme Court precedents a tying claim consists solely of the three elements quoted above. Assuming economic power over the tying product and a not insubstantial amount of commerce, the plaintiff need only show that a seller conditioned the sale of one product (the tying product) on the purchase of another product (the tied product). It has never been an element of plaintiff's case to disprove, nor even a permitted defense, that the tied product is superior to others available on the market, or that even without the tie requirement plaintiff would have purchased the tied product. The short answer to defendants' contention is, and has always been, that without a tie requirement, "(i)f the manufacturer's brand of the tied product is in fact superior to that of competitors the buyer will presumably choose it anyway." Standard Oil Co. v. United States, 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949). Cf. United States Shoe Machinery Corp. v. United States, 258 U.S. 451, 462, 42 S.Ct. 363, 66 L.Ed. 708 (1922).
 
 
 64
 The purpose of the rule against tying is to insure that a buyer's choice is counseled solely by his perception of the merits of the tied product, so that the seller with economic power over the tying product does not gain an artificial advantage over competitors engaged in sales of the tied product. The antisocial conduct which the rule seeks to deter is the act of the seller conditioning sale of one product upon purchase of another. One can hardly imagine anything which would vitiate that purpose more than a requirement that a violation depends upon proof that the buyer bringing suit would not have purchased the tied product but for the tie requirement. The issue is whether the seller acted in a certain way, not what the buyer's state of mind would have been absent the seller's action.
 
 
 65
 The rule for which defendants contend would be analogous to a rule in price-fixing cases either requiring plaintiffs or permitting defendants to prove that the market set prices would have been no lower than the fixed prices a proposition long since put to rest. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222-23, 229, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Trenton Potteries Co., 273 U.S. 392, 396-401, 47 S.Ct. 377, 71 L.Ed. 700 (1927). We therefore conclude that once a plaintiff proves that a defendant has conditioned the sale of one product upon the purchase of another there is no requirement that he prove that his purchase was coerced by the seller's requirement.
 
 
 66
 b
 
 
 67
 A number of cases have recognized, however, that an illegal tie-in may exist even when the seller has not expressly conditioned the sale of one product upon purchase of another, if the existence of a tie-in can otherwise be established from business conduct. E. g., Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55, 64 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). In many situations in which the existence of a tie-in is proven on the basis of business conduct, a dominant party, such as a franchisor, suggests, persuades or requests that the economically dependent party, such as a franchisee, purchase certain products in conjunction with other products which the franchisee sought to buy. The claim is that there is more in this seemingly innocent conduct than meets the eye. The franchisee claims that the franchisor has created an economic arrangement in which the perceived threat of termination buttresses the franchisor's salesmanship. We considered this type of claim in the context of a class action certification in Ungar, supra.
 
 
 68
 In Ungar, all of the franchise agreements avoided conditioning the sale of the allegedly tied products on the purchase of the franchise, and some affirmatively secured to the franchisee the right to purchase those products from other suppliers. Plaintiffs nevertheless claimed that this right was illusory because they were coerced into accepting unwanted products from the franchisor or its designee. The district court held that the " 'individual coercion mode of proof of use is inapplicable in a class context. . . .' " and that " '. . . (P)ersuasion or influence may be the virtual equivalent of coercion where there is an unequal relationship between the parties . . .,' (or (that) use of economic power in a class context may be inferred) 'from the acceptance by large numbers of buyers of a burdensome or uneconomic tie.' " 531 F.2d at 1217 quoting 68 F.R.D. at 114-15. We rejected this conclusion holding that, on the facts of that case, coercion was a necessary element of a prima facie case and that each franchisee must prove coercion on an individual basis. 531 F.2d at 1226.
 
 
 69
 Although in Ungar we spoke of coercion as being implicit in the leverage concept upon which the tying rule is premised, we were not articulating coercion as a separate legal element of proof. As we indicated in III B 1 a supra, leverage or coercion is implicit when plaintiff proves the conditioning of sales of one product upon purchase of another. We read Ungar to have required coercion to be proven only because the conditioning of the sale of one product upon purchase of another was not reflected in the agreement or in the operation of its terms. We refused to "construct" such a condition from proof of salesmanship coupled with dominance of the seller over the buyer. The principle of Ungar is that when a class action tie-in claim is made, without basis in an express agreement,[9] proof of salesmanship coupled with inequality of bargaining power does not prove the existence of a tie, but rather proof of actual coercion on an individual basis is necessary to prove the existence of a tie.
 
 
 70
 c
 
 
 71
 All but one of the cases which we have found discussing coercion as an element of proof in a tying claim have application to the situation in which the existence of a tie-in is sought to be proved on the basis of a request or suggestion coupled with pressure, intimidation, in short coercion.[10] In American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., 446 F.2d 1131 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972), for example, an insurance company developed an advertising program which called for sponsoring the Evening Report over a number of local stations. During negotiations with ABC, the company was able to add at least some of the 28 stations it particularly desired to the 99 station lineup originally offered. It later contended that the lineup included 32 unwanted stations which were allegedly tied to the desirable stations. The Second Circuit affirmed the finding of the district court that the company had not proven that it was coerced to accept the lineup agreed upon. Coercion was an essential element of proof in that case because the existence of two separate products necessary to establish a tie could not be determined without reference to the buyer's state of mind, since advertising on one configuration of stations as opposed to another cannot be differentiated apart from the particular advertiser's wants. See also Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1326-1331 (5th Cir. 1976) (coercion required when lease agreement specifies that franchisee free to obtain putative tied product from any source); Davis v. Marathon Oil Co., 528 F.2d 395 (6th Cir. 1975), cert. denied, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976) (claim of tie-in of TBA to gasoline rejected when lease did not require purchases and evidence did not show coercion); Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir.), cert. denied, 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972) (coercion required when putative tie based upon request to purchase TBA rather than requirement to do so).
 
 
 72
 One case, Capital Temporaries, Inc. v. The Olsten Corp., 506 F.2d 658 (2d Cir. 1974), does not fit within this pattern. A coercion requirement was regarded in that case as part of the analysis of the third element of a tying claim: dominance or economic power in the market for the tying product. The case has been so regarded in the Second Circuit. Hill v. A-T-O, Inc., 535 F.2d 1349, 1355 (2d Cir. 1976).
 
 
 73
 There have been several cases in which the claim that actual coercion was necessary to prove the existence of a tie-in has been rejected because the seller expressly conditioned sale of one product upon purchase of another. E. g., Hill v. A-T-O, Inc., supra; Aamco Automatic Transmissions, Inc. v. Tayloe, 407 F.Supp. 430 (E.D.Pa.1976); Esposito v. Mister Softee, Inc., 1976-1 Trade Cas. Para 60,887 (E.D.N.Y.1976).
 
 2. The Existence of a Tie-In
 
 74
 In order to apply the legal standards stated above to the claims made here, it is necessary to first identify in greater depth the nature of the claims. The complaint indicates that plaintiffs seek relief on two distinct grounds. Plaintiffs contend that it is illegal for defendants to require as a condition to the leasing of a gas station site that the lessee purchase gasoline only from defendants (lease claim). The second claim is that it is illegal for defendants to require dealers to sell only gasoline supplied by defendants from pumps bearing their trademark (trademark claim).
 
 
 75
 a. Lease Claim
 
 
 76
 There is no single lease provision which requires that the lessee purchase all gasoline from his lessor. Plaintiffs contend that a constellation of lease provisions in each agreement accomplish the same result, however. These provide that the lease shall expire in 6 or 12 months, that lessee can make no alterations to the leasehold without lessor's approval, that lessee must license the use of lessor's trademark, that as a condition of the trademark, lessee not sell gas other than that provided by lessor from pumps bearing lessor's trademark, that lessee pay rent as a percentage of gas volume sales subject to a minimum rent, and that the lease shall terminate whenever the lessee fails to purchase a stated quantity of gasoline.
 
 
 77
 Defendants argue that these provisions would not prevent a lessee from installing his own pumps and tanks from which to sell other brands of gas. Plaintiffs assert that it is uneconomical to invest thousands of dollars in construction of tanks and pumps on a 6- or 12-month lease, that such alteration is grounds for termination, and that the minimum purchase quotas would insure termination if competing brands were sold.
 
 
 78
 The district court held that since there is no single lease provision which expressly requires lessees to purchase gas from defendants, the lease tie-in claim presented disparate legal and factual questions because (i) it would be necessary to make "a factual determination in each and every lease that there was such economic coercion in fact as to constitute an illegal tie-in agreement; and (ii) maintenance as a class action would require the examination of over 400 various contractual forms used by the 15 defendants to determine whether the various leases have the effect of precluding purchase of gasoline from other than the lessor.
 
 
 79
 (i) Coercion
 
 
 80
 We cannot agree with the district court that proof of coercion is necessary to the existence of a tie-in on the theory under which the lease claim is brought. Plaintiffs do not contend that defendants pressured them into refraining from selling competing brands, but that the lease contracts themselves precluded them from doing so. Defendants acknowledge that the only way a lessee could sell other brands under the lease agreements would to be install his own pumps and tanks. Whether such a course is realistically open to a short term lessee is a common question of fact which can be developed by expert testimony concerning the relative costs and benefits of making such installations. Similarly, a lease provision which permits termination of the lease when a stated quantity of gasoline is not purchased from the lessor hardly leaves the lessee open to reject some or all of the lessor's gas in favor of that of a competitor. If plaintiffs are able to show that the lease agreements in use by all defendants have similar clauses which have the practical economic effect of precluding sale of other than the lessor's gasoline, they will have shown that the purchase of gasoline was tied in to the lease of the service station. Under these circumstances the lease agreement itself conditions the sale of one product (here a lease) upon purchase of another, and as we indicated in part III B 1 a, supra, proof of coercion is not a required element of plaintiffs' case.[11] Thus, this case differs from Ungar in which plaintiffs' proof of the existence of a tie-in focused not on the terms of the agreement but on proof of salesmanship accompanied by threats of termination.[12](ii) Variety of Contractual Forms
 
 
 81
 Assuming that plaintiffs do not have direct evidence of a conspiracy among the defendants, it will be necessary for plaintiffs to introduce evidence of the various lease agreements used by each defendant in order to show parallel business behavior from which a conspiracy can be inferred. If the action were not sought to be maintained on a class basis, a single plaintiff, in order to prove a conspiracy on this basis, would have to prove this much.[13] When the action is brought by the class, the nature of the proof is no different, however. Plaintiffs' claim is not that each defendant imposed a tie-in on every dealer, but that all defendants conspired to impose tie-in arrangements on each dealer and that without the agreement of all, none could do so successfully. Thus, the district court incorrectly identified the legal issue. While the nature of the claim is such that proof will be detailed and lengthy, the factual and legal questions presented in this phase will be precisely the same in a class action as they would be in an individual suit.
 
 
 82
 b. Trademark Claim
 
 
 83
 Plaintiffs contend that all gasoline of the same octane rating is fungible, that defendants, in fact, exchange their gasolines when convenient, and, citing Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), that defendants' trademarks should therefore be regarded as warranting only the quality rather than the source of the gasoline. The district court noted:
 
 
 84
 defendants concede that a trademark protection clause in one form or another is contained in every lease agreement or arrangement between the defendant oil companies and their respective lessees. These clauses, are the primary basis for plaintiffs' claims of illegal tying agreements. In general, the trademark protection clauses, however worded, prohibit a lessee from selling any gasoline under the lessor's trademark or brand name or from any of the pumps or tanks bearing lessor's trademark or brand name or insignia, unless such gasoline is sold and supplied to lessee by the lessor. 62 F.R.D. at 128 (footnote omitted)
 
 
 85
 The court also opined that "(I)f the sole question were whether such trademark protection clauses, however worded, constituted in and of themselves violation of the antitrust laws, a class action for determining the legality of such a clause might be appropriate." Id. at 136.
 
 
 86
 We think that these statements indicate that the trademark claim presents a uniform question of law common to the class. Fairly read, plaintiffs' contention is that the trademark protection clauses, both singly and in conjunction with other clauses evidence an antitrust violation. Even assuming that the court were correct in its conclusion that the lease claim is not appropriate for class determination, it nevertheless should have considered certification of the trademark claim under Rule 23(c)(4)(A).
 
 
 87
 3. Sufficient Economic Power Over the Tying Product (leaseholds) to Appreciably Restrain Competition in the Tied Product (wholesale gasoline sales)
 
 
 88
 The district court recognized that strategic land sites can be used as a tying product, but thought that in order to maintain a class action it would be necessary to determine that every oil company-leased station in the country was so strategically located as to be able to restrain competition in the tied product. we agree with plaintiffs that market power can be demonstrated without examining whether each gas station is strategically located. Plaintiffs could show, for example, that the defendants controlled a majority of existing service stations and that because zoning restrictions and high capital costs make development of new stations difficult, the defendants have sufficient market dominance over existing stations to impose a tie-in. We find unpersuasive defendants' efforts to distinguish Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). See generally United States Steel Corp. v. Fortner Enterprises, Inc., 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977); Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).
 
 4. Existence of a Conspiracy
 
 89
 The district court was correct in concluding that this question is one common to the class.
 
 5. Fact of Damage
 
 90
 If plaintiffs prove a violation of the antitrust laws they must still prove that they have suffered the "fact of damage" as a consequence of the violation in order to recover under § 4. The district court seems to have assumed that the fact of damage would have to be proven on an individual basis. For the reasons we will discuss, there is nothing in this record which persuades us that this necessarily is the case.
 
 
 91
 There are two distinct aspects to what in antitrust literature has come to be known as a requirement of fact of damage in private suits under § 4 of the Clayton Act. See Pollock, The "Injury" & "Causation" Elements of a Treble-Damage Antitrust Action, 57 Nw.L.Rev. 691 (1962). One of these is founded upon the recognition that some limitation must be placed upon liability stemming from violations which may have a widespread and unforeseeable ripple effect throughout the economy. Thus, notwithstanding the language of § 4 that "(a)ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ," as a matter of policy, courts have uniformly limited the private action to those plaintiffs whose injury is not too indirect, remote or incidental a consequence of a violation. This policy has been expressed under the rubric of "standing" and implemented under a "target area" test, see, e. g., Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), or by a more detailed, functional inquiry. See Cromar Co. v. Nuclear Material Equipment Corp., 543 F.2d 501, 506 (3d Cir. 1976). We have addressed this aspect, supra and will not refer to it again.
 
 
 92
 The second aspect is comprised of two elements that plaintiff suffered some loss in his business or property and that there is a causal relationship between the violation and the loss. Fact of damage in this sense is purely factual and does not involve questions of policy in its routine application. It advances no policy apart from the simple concept of causation that plaintiff has suffered loss as a consequence of the violation. See Bigelow v. United States, 327 U.S. 251, 257-60, 66 S.Ct. 574, 90 L.Ed. 652 (1946).
 
 
 93
 Since, as we have indicated, the second aspect of fact of damage is a simple concept of causation, any evidence which is logically probative of a loss attributable to the violation will advance plaintiff's case. There is absolutely no requirement that the loss be personal or unique to plaintiff, so long as the plaintiff has suffered loss in his business or property, for as we have noted, this second aspect of fact of damage is not concerned with any policy of limiting liability. Thus, when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.
 
 
 94
 Our conclusion is not at variance with recent cases in other circuits indicating that fact of damage could not be proven on a class basis, since those cases turned upon their individual facts, rather than upon a rule of law precluding common proof of fact of damage. See, e. g., Shumate & Co., Inc. v. National Association of Securities Dealers, Inc., 509 F.2d 147, 155 (5th Cir.) cert. denied, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975); In Re Hotel Telephone Charges, 500 F.2d 86, 89 (9th Cir. 1974). On the other hand, it has been recognized that fact of damage can be proven on a common basis. See, e. g., City of Philadelphia v. American Oil Co., 53 F.R.D. 45, 60, 67-68 (D.N.J.1971); In Re Antibiotic Antitrust Actions, 333 F.Supp. 278, 281, 287 (S.D.N.Y.1971); Developments, Class Actions, 89 Harv.L.Rev. 1318, 1513 n. 301. See generally Wall Products Co. v. National Gypsum Co., 326 F.Supp. 295, 327 (N.D.Cal.1971).
 
 
 95
 The method by which loss will be proven may depend upon the type of violation involved and its impact on plaintiff's business or property. For example, if anticompetitive practices result in the destruction of plaintiff's business, he may recover as damages lost profits or the going concern value of the business. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). If, however, defendants supply an article at supracompetitive prices, plaintiff may recover the amount of the illegal overcharge. See Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 487-90, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). When plaintiff elects to prove damages on the basis of lost profits or going concern value, it would seem that his proof necessarily would focus on the operation of his business. But, if plaintiff seeks to establish payment of an illegal overcharge, the nature of proof may well be different.
 
 
 96
 If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "(The) burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . . . proof of some damage flowing from the unlawful conspiracy . . . ." Zenith Radio, supra, 395 U.S. at 114, 89 S.Ct. at 1571 n. 9. Under these circumstances, proof on a common basis would be appropriate. Even if the variation in price dynamics among regions or marketing areas were such that in certain areas the free market price would be no lower than the conspiratorially affected price, it might be possible to designate subclasses to conform with these variations. See In Re Antibiotic Antitrust Actions, supra, 333 F.Supp. at 281.
 
 
 97
 Since in this case neither the parties nor the district court focused upon the issues which would determine whether fact of damage may be proven on a class basis, we think the matter should be reconsidered by the district court in light of this opinion. If the district court should conclude that fact of damage cannot be proven on a class basis, it should also consider the problem, which we noted but did not reach in Link v. Mercedes Benz of North America, Inc., 550 F.2d 860 (3d Cir. 1977) (in banc), of whether it may and should bifurcate the trial between violation before one jury and fact of damage and damages before another. See 550 F.2d at 874-78 (Gibbons, J. dissenting); Windham v. American Brands, Inc., 539 F.2d 1016 (4th Cir. 1976), reargued in banc Feb. 14, 1977.
 
 6. Damages
 
 98
 As we have already indicated, plaintiffs could elect to prove damages on the basis of an illegal overcharge rather than by proving a loss of net profits as the district court thought would be required.
 
 
 99
 The district court also thought that plaintiffs' proof of damages would be subject to the defense that, due to competition at the retail level, any lower wholesale price which would have obtained under a competitive wholesale market would be passed on to the consumer, leaving the dealer no better off. This fact, it thought, would require complicated and varying proof of local market conditions to prove loss of profit. The court is indeed correct that such an inquiry would be enormously complicated, posing a tremendous burden on the presentation of plaintiffs' case. But it is precisely for this reason that the Supreme Court eliminated the "passing-on defense" in Hanover Shoe, Inc., supra, 392 U.S. at 491-494, 88 S.Ct. 2224, a holding which it reaffirmed recently in Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).
 
 
 100
 With respect to the calculation of the amounts of damages, it would be necessary for each member of the class individually to prove the quantity of gasoline purchased at supracompetitive prices and the price paid. Nevertheless, it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate. E. g., Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 457 (E.D.Pa.1968); Dolgow v. Anderson, 43 F.R.D. 472, 490-91 (E.D.N.Y.1968). If for any reason the district court were to conclude that there would be problems involved in proving damages which would outweigh the advantages of class certification, it should give appropriate consideration to certification of a class limited to the determination of liability. See Rule 23(c)(4)(A).
 
 
 101
 C. Comparative Fairness and Efficiency Criteria
 
 
 102
 The district court's reasons for concluding that a class action would not be superior to the prosecution of numerous individual suits appear at 62 F.R.D. 124 at 139-40. Although we are convinced that each is erroneous, we do not feel compelled to address them individually. Suffice it to say that our disagreement with each is both complete and fundamental. There is one point which bears comment, however. Without explaining the basis for its opinion, the court concluded that compliance with the notice provision presented significant problems of manageability. Plaintiffs proposed that individual notice be sent to each current lessee along with regular correspondence regularly sent by the defendants to their dealers. We think this proposal fair, efficient, fulfilling of the purposes of the rule and readily controllable by the court.
 
 
 103
 With respect to former lessees, however, plaintiffs proposed notice by publication in trade journals. If the names and addresses may be ascertained through reasonable effort, regardless of expense, plaintiffs must bear the cost of individual notice to every proposed member of the class. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). If plaintiffs indicate that they are unable or unwilling to bear this expense, the class certification, if granted, must be limited to current lessees. But even if the former lessees are retained in the class, we do not, at this point, perceive that the mechanics of providing notice will present insuperable management problems for the court. The court, may, we think, direct and supervise the mechanics of providing notice without directly performing them. See 3B Moore supra at Paras. 23.45(4.-4), 23.55.
 
 D. Class Action Issues: Conclusion
 
 104
 We conclude that the district court erred in identification of the issues which are common to the class. As we have indicated, all of the issues necessary to determine violation and, possibly the determination of the fact of damage as well, are, under established legal principles, common and triable on a class basis. We further conclude that the district court erred in evaluating the comparative fairness and efficiency criteria in making its finding of the superiority vel non of maintaining the action on a class basis.
 
 
 105
 The judgments of the district court will be vacated and the cases remanded for further proceedings consistent with this opinion. The order refusing class certification will be vacated and the cases remanded for reconsideration in the light of this opinion.
 
 
 106
 ALDISERT, Circuit Judge, dissenting.
 
 
 107
 I agree with the majority that this court has jurisdiction of the appeal under 28 U.S.C. § 1291 and Rule 54(b), F.R.Civ.P., and that the plaintiffs have standing to sue non-lessors under §§ 4 and 16 of the Clayton Act. At that point, however, I part company with my brothers. In my view, the decision of the district court holding that plaintiffs have failed to state a claim under § 1 of the Sherman Act should be affirmed, as should its decision denying class certification.
 
 I.
 A.
 
 108
 My first, and most fundamental, disagreement with the majority concerns the role of pleading and discovery in this kind of litigation. The majority says that a "complaint is much too blunt an instrument with which to forge fundamental policies." But, if a complaint cannot even be depended on to state the essential theory of the litigation, I do not know how a court can correctly resolve the particular case, must less forge fundamental policies. This is not a pro se case. Plaintiffs' counsel are competent, experienced and, in fact, nationally renowned attorneys in the antitrust field. Nor is this a case that was hastily terminated by summary judgment. The original complaints were filed in 1971, the Bogosian complaint was amended in 1972, and both complaints were amended in 1973. Now, six years after the action was commenced, the majority remarks that it is "unwilling to speculate at this stage as to the plaintiffs' theory." In my view, this case has long since passed the stage where anyone concerned parties, lawyers, or judges should have to speculate as to the theory of the litigation.
 
 
 109
 The majority's precise holding is that "the ruling that the specific allegation of interdependent consciously parallel action made here fails to state a claim should be vacated so that the issue can be decided, if necessary, after the relevant facts are fully developed." This is jurisprudential anarchy. Although the majority purports to act in the interest of efficient judicial administration, I fail to see how that interest is served by allowing what probably will be massive discovery prior to deciding whether the basic theory of the action is legally viable. The relevant facts should be fully developed after it is determined whether the claim is legally sufficient, not while that issue is still in doubt. Moreover, until the theory of the case is settled, it will not be known which are the "relevant" facts. Facts are only relevant insofar as they support a valid legal theory.
 
 
 110
 A motion to dismiss or for summary judgment for failure to state a claim seeks to obviate the necessity for time-consuming and expensive discovery in cases where the facts are irrelevant because no legal claim has been stated. Requiring discovery as a predicate to deciding such a motion defeats the very purpose of the motion. Although the majority says that further factual development will help to test the legal theory, I do not think that is the case here. The question is whether an allegation of interdependent consciously parallel action states a Sherman Act claim. Either it does or it does not. That may be a sophisticated question, but it is a question of policy, not of fact. The kind of adjudicative facts which will be developed by discovery in a particular case concerning particular plaintiffs and defendants in a particular industry will be of no help whatsoever.
 
 
 111
 I accept the principle that summary judgment is to be sparingly granted in complex antitrust cases. Primarily, this applies to cases where a cognizable claim has been stated and the question is whether there are disputed material issues of fact. I do not understand the principle as undermining the utility of pre-trial motions to test the sufficiency of a complaint. The Federal Rules require that a complaint make a "short and plain statement of the claim showing that the pleader is entitled to relief." F.R.Civ.P. 8(a).
 
 
 112
 Federal procedure relies on notice pleading rather than fact pleading, but at a minimum, as explained by the Advisory Committee on Civil Rules in October, 1955, the pleader is required "to disclose adequate information as the basis of his claim for relief". 2A J. Moore, Federal Practice P 8.01(3) (2d ed. 1974). Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), teaches that "the defendant (be given) fair notice of what the plaintiff's claim is and the grounds upon which it rests," (emphasis supplied), and we have recently reiterated that the defendant is entitled to "fair notice of the claim asserted." Joiner Systems, Inc. v. AVM Corp., 517 F.2d 45, 47 (3d Cir. 1975).
 
 
 113
 Universe Tankships, Inc. v. United States, 528 F.2d 73, 75-76 (3d Cir. 1975). In massive and protracted cases like this, the attorneys bear a particularly heavy responsibility to narrow and simplify the issues as soon as possible. Where, after six years, it is still possible to speculate as to the exact nature of the claim asserted, then I think it is time for the district court to do its best in grasping the essential intendment of the complaint and, if no claim is stated, to dismiss or grant summary judgment for failure to state a claim. That is exactly what the district court did, and I would affirm its action.
 
 B.
 
 114
 My reading of the complaint differs from the majority's. After two or three amendments by skilled counsel, I think it is time to take the words of the complaint for what they actually say. By amendment to their complaint and pursuant to what the district court termed a "deliberately employed strategy", 393 F.Supp. 1046, 1048 n.5, plaintiffs' counsel deleted their allegations of conspiracy and substituted allegations of "interdependent consciously parallel action". As the majority correctly notes, plaintiffs were not required to plead evidence. They did not do so. They did not allege that a contract, combination or conspiracy existed and that it would be proven by evidence of interdependent consciously parallel action. Rather, they alleged that defendants had engaged in interdependent consciously parallel action in violation of § 1 of the Sherman Act. Even construing paragraphs 13, 14, 16, 17 and 18 of the second amended complaint most favorably to the plaintiffs, it alleges that interdependent consciously parallel action is a "combination" for Sherman Act purposes. And that is just not so.
 
 
 115
 It is well settled, and indeed it is not here disputed, that conscious parallelism is not a violation of § 1 of the Sherman Act. Theater Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Klein v. American Luggage Works, Inc., 323 F.2d 787 (3d Cir. 1963); Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199 (3d Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). The leading case, Theater Enterprises, explains:
 
 
 116
 The crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express. To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). But this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense.
 
 
 117
 346 U.S. at 540-41, 74 S.Ct. at 259. From this, it is clear to me that consciously parallel behavior is admissible as circumstantial evidence of a properly pleaded contract, combination or conspiracy. That is the point that was implicated in Venzie Corp. v. United States Mineral Products Co., 521 F.2d 1309 (3d Cir. 1975). In Venzie, we specifically noted that the plaintiffs "relied on . . . circumstantial evidence . . . as proof of agreement. Their evidence does not, however, include two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior . . .". Id. at 1314. Venzie was an appeal from an order granting a defendants' motion for judgment n. o. v. As such, it was our obligation to review the plaintiffs' evidence, and we concluded that they had not met their burden of proving conspiracy. This, however, is not an appeal from a judgment n. o. v., it is an appeal from a summary judgment for failure to state a claim. We are faced not with a question of evidence, but with a question of pleading.
 
 
 118
 As it is clear from Theater Enterprises that consciously parallel behavior may be circumstantial evidence of an agreement, so also is it clear that consciously parallel behavior alone does not violate the Sherman Act. And, therefore, an allegation of consciously parallel behavior, without more, would not state a Sherman Act claim. But, if an allegation of consciously parallel behavior is legally insufficient, I am unable to see how an additional allegation of interdependence cures the insufficiency.
 
 
 119
 If there is anything in this case that hearkens back to "magic words", it is not, as the majority suggests, the requirement that a Sherman Act complaint allege concerted action of some kind. It is rather, the asserted power of the word "interdependent" to breathe vitality into a lifeless theory of recovery. Nowhere has the talismanic character of that word been explained to my satisfaction. Indeed, it seems to me that interdependence is implicit in the notion of conscious parallelism and that the added word is hardly more than a redundancy. In the usual situation of parallel business behavior, a businessman is conscious of what his competitor is doing and his action, or inaction, depends on what the competitor does. This is not a violation of the antitrust laws; it is, in fact, the essence of the competitive behavior that those laws seek to promote. Because his competitor takes the same attitude toward him, the two businessmen are mutually conscious of each other and their actions are "interdependent". In a concentrated industry, such mutually conscious and interdependent conduct by several competitors may have anti-competitive effects. But it is not necessarily collusive, and I cannot understand how a proliferation of descriptive words changes the legal status of the conduct. Until there is a contract, combination or conspiracy, in restraint of trade, there is no § 1 violation. As the Supreme Court observed in Theater Enterprises: "Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but 'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely." 346 U.S. at 541, 74 S.Ct. at 259 (footnote omitted).
 
 
 120
 In their brief in this court, plaintiffs rely primarily on Wall Products Co. v. National Gypsum Co., 326 F.Supp. 295 (N.D.Cal.1971), and Modern Home Institute, Inc. v. Hartford Accident and Indemnity Co., 513 F.2d 102 (2d Cir. 1975). Based on these decisions, they say "it is clear that (the courts) have uniformly held that proof of interdependent conscious parallel action, while not conclusive proof of a Section 1 Sherman Act violation, is sufficient to support a finding of violation." Appellants' Brief at 21. In my view, it is not necessary to agree or disagree with that reading of the cases in order to affirm the summary judgment here.
 
 
 121
 Like the majority, the plaintiffs have mistaken an issue of pleading for an issue of evidence. We are not presented with a situation where interdependent consciously parallel action however that may differ from merely consciously parallel action has been introduced as evidence of a properly pleaded contract, combination or conspiracy. Nor are we presented with the issue whether such evidence alone would be sufficient to support a finding of concerted action. Instead, we are presented with the pure question of law whether an allegation of interdependent consciously parallel action, without more, states a claim under § 1 of the Sherman Act. In my view, it does not. As no amount of discovery can cure a complaint that fails to state a claim, I would affirm the entry of summary judgment.
 
 II.
 
 122
 Having said initially that it is "unwilling to speculate at this stage as to the plaintiffs' theory," the majority proceeds to "identify in greater depth the nature of the claims" and to conclude that the district court erred in denying class certification. For purposes of summary judgment, apparently, the exact theory of the case remains foggy to the majority, but for purposes of class action determination the detailed elements of the claim have become pellucid. If the exact nature of the legal theory is clear, then the case is ripe for a test of whether a claim has been stated. If the legal theory is not clear, then the question of class certification ought to abide the clarification of the issues.
 
 
 123
 This is not an ordinary class action. Plaintiffs do not seek to form a class of all Exxon dealers, or all Gulf dealers, or all Texaco dealers. They seek to form a truly titanic class of all present and former lessee gasoline dealers of 15 different oil companies. The only limitation on the class is that the dealers be located in areas having a population over 15,000. At the very least, the size and diversity of the asserted class raise serious questions about the propriety of class action treatment. Moreover, the members of the class are not consumers with individually small or de minimis claims. Nor are the class members persons who have been deprived of non-quantifiable civil rights. The class members are businessmen, more or less sophisticated, with significant and definite financial interests in the litigation. This is not, therefore, a case where it would be economically impractical to prosecute individual actions.
 
 A.
 
 124
 The majority has concluded that the district court erred when it found that common questions would not predominate over individual ones, as required by Rule 23(b)(3). I disagree. Rather than paraphrasing, I prefer the exact language concerning our review of a predominance finding as stated in Katz :
 
 
 125
 If the district court has properly identified the issues common and diverse, we would undoubtedly defer in most instances to its conclusion as to predominance, since that requirement relates to the conservation of litigation effort, and the trial court's judgment probably will be as good as ours. If the district court has applied the correct criteria to the facts of the case, then, it is fair to say that we will ordinarily defer to its exercise of discretion.
 
 
 126
 Katz v. Carte Blanche Corp., 496 F.2d 747, 756 (3d Cir.), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). The majority's analysis, in my opinion, pays no more than lip service to the discretion which a district court must have in evaluating the propriety of class certification in such a massive proceeding as this.
 
 
 127
 The majority says that the district court erred in identifying the issues which are common to the class. This is not to say that the district court, in its thorough treatment, failed to identify any issues in the case. Rather, this is a euphemistic way of indicating that the majority disagrees with the district court's decision to require individualized proof on certain issues. I believe that the judicial structuring of the proof, especially in a complicated proceeding like this one, lies necessarily and unalterably within the discretion of the district court. Not only do I find no abuse of that discretion, but, on most points, my own analysis would track the district court's quite closely.
 
 
 128
 Concerning the lease claim, the majority correctly states that "(t)here is no single lease provision which requires that the lessee purchase all gasoline from his lessor." It goes on to say, also correctly, that it is a "constellation of lease provisions" which allegedly has the practical economic effect of tying the purchase of gasoline to the lease of the service station. Then, having admitted that whether the lessee realistically could sell other brands of gasoline is a "question of fact which can be developed by expert testimony concerning the relative costs and benefits of (installing the lessee's own pumps and tanks)," the majority nevertheless concludes that the practical economic effect of the various lease provisions would present a common question, provable by common proof. Even if there were only one defendant oil company and only one form contract, the practical economic effect would vary from dealer to dealer, city to city, and region to region. It might, for example, be economically feasible for a large volume dealer in a large city to install his own pumps and tanks while it might not be feasible for a smaller dealer in a smaller city to do so. Here there are more than a dozen oil companies, with operations concentrated in different regions of the country, and there are more than 400 different forms of contracts and agreements. A fortiori, the practical economic effects of the agreements will present diverse questions.
 
 
 129
 The question of market power in the tying product, leaseholds, will similarly present diverse, not common, questions. The majority asserts that market power could be demonstrated by showing that "defendants controlled a majority of existing service stations and that because zoning restrictions and high capital costs make development of new stations difficult, the defendants have sufficient market dominance over existing stations to impose a tie-in." I have at least two serious problems with this line of reasoning. To begin with, I have no doubt that plaintiffs could show that defendants control a majority of existing stations. This follows almost tautologically from the fact that plaintiffs have named as defendants most of the major companies in a concentrated industry. This element of proof can be satisfied in any reasonably concentrated industry simply by naming enough defendants. Secondly, I fail to see how zoning restrictions and capital costs could be established by common proof. Certainly zoning laws vary from city to city, and I have no doubt that the capital costs of developing a station do also.
 
 
 130
 The majority concedes that the quantum of damages would have to be individually established. But it finds "nothing in this record which persuades us" that the fact of damage would have to be individually proven, and directs the district court to reconsider the matter in light of the majority's opinion. Although I agree with the majority that the propriety of proving the fact of damage on a common basis depends on the circumstances of the case, I find nothing in this record which persuades me that the fact of damage would not have to be individually proven. There is no reason why there might not be dealerships which suffered no damage at all as a result of defendants' conduct, be it legal or illegal. As the majority observes, it is possible that "in certain areas the free market price would be no lower than the conspiratorially affected price." For me, however, the issue is of little importance as I would not upset the district court's predominance finding even if the fact of damage were a common question.
 
 
 131
 I do not dispute the fact that there may be common questions. For example, if a conspiracy had been alleged, that would present a common question subject to the same proof whether made on behalf of one plaintiff or a thousand. But the fundamental issue is not the existence of common questions, it is whether the district court abused its discretion in concluding that common questions would not predominate. This is not simply a matter of numbering the questions in the case, labelling them as common or diverse, and then counting up. It involves a sophisticated and necessarily judgmental appraisal of the future course of the litigation, as well as an evaluation of the most efficient means of proving the claims and the time that will be consumed by each aspect of the proof. The district court is in a position to do that; we are not.
 
 
 132
 In my opinion, the district court made no significant error in identifying the issues as common or diverse, it correctly applied the criteria of Rule 23 to the facts, and it clearly did not abuse its discretion in concluding that common questions would not predominate in this colossal but intricate proceeding.
 
 B.
 
 133
 The majority has also concluded that the district court's reasons for finding the class action not to be superior to other adjudicative vehicles were "erroneous". Again, Katz articulates the standard of review of a finding on the issue of superiority: "(O)ur review looks first at whether the district court properly applied the relevant criteria to the facts of the case. If this has been done it is fair to say that we will ordinarily defer to its exercise of discretion." 496 F.2d at 757.
 
 
 134
 In this case the district court not only made the ultimate finding of lack of superiority, it expressly applied the subsidiary criteria, which the rule suggests as pertinent, to the facts. It found a significant class member interest in individually controlling separate actions which, as I have indicated, would not necessarily be impractical. It found that disparate factual considerations made concentration of the litigation in one forum not desirable or advantageous. And it found that management of the action would present "enormous difficulties." 62 F.R.D. at 140. We have previously observed that the question of manageability of a class is largely a factual question and that the district court has a "wide range of discretion" in the matter. Link v. Mercedes Benz, 550 F.2d 860, 864 (3d Cir. 1977) (plurality opinion); see Neely v. United States, 546 F.2d 1059, 1069 (3d Cir. 1976).
 
 
 135
 If, for some reason, this case falls outside of the Katz promise "ordinarily" to defer to the district court's exercise of discretion, that reason is not stated by the majority. Nor am I aware of any reason why this case requires such a departure from settled precepts. I would hold that the district court properly applied the relevant criteria to the facts of the case, and that its finding on the question of superiority was well within the wide range of discretion which it had.
 
 
 136
 If the district court saw fit to reconsider its class action decision at a later point in the litigation, that would be within its power under Rule 23(c) (1). But I can see no basis at present for upsetting its denial of the class certification, and I would, therefore, affirm that denial.
 
 
 
 [1]
 Rule 56(f) provides:
 Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
 
 
 [2]
 We recognize that whether the complaint fairly alleges concerted action in the form of a conspiracy or combination is one of the issues on this appeal. For present purposes in the interest of clarity we will refer to the claim against the nonlessor defendants as the "concerted action" or "conspiracy claim."
 
 
 [3]
 Since the nonlessor defendants are not parties in the claim pending in the district court, mutuality is lacking. Nevertheless, we have indicated that a lack of mutuality will not preclude defensive use of collateral estoppel at least absent special circumstances indicating unfairness. Provident Tradesmen's Bank & Trust Co. v. Lumbermen's Mutual Cas. Co., 411 F.2d 88, 92-94 (3d Cir. 1969). See also Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)
 
 
 [4]
 "To avoid conflicts in panel decisions no subsequent panel may overrule a published opinion of a previous panel. Court in banc consideration is required to overrule a previous decision of this Court." Internal Operating Procedures of the United States Court of Appeals for the Third Circuit at 13
 
 
 [5]
 Section 4, 15 U.S.C. § 15 provides:
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 Section 16, 15 U.S.C. § 26 provides inter alia :
 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity under the rules governing such proceedings, . . .
 The parties have not pointed to any doctrinal distinctions between sections 4 and 16 which would require individual discussion of the issues under each. We will, therefore, for the sake of convenience, discuss both problems together under § 4.
 
 
 [6]
 On first glance it may seem anomalous that we discussed nonjurisdictional issues prior to discussing standing. The policy of limiting liability implicit in § 4 which has evolved under the rubric of "standing," however, is a concept of proximate causation distinct from the concept of personal stake necessary to establish article III jurisdiction. Our discussion here deals only with the former concept which has been misnamed "standing."
 
 
 [7]
 Parisi was a lessee of Exxon from 1968-71, but is now, according to his deposition testimony, a lessee of Atlantic Richfield
 
 
 [8]
 We believe that proof that a not insubstantial amount of interstate commerce is affected can be adduced on a common basis and consequently that element will not be further discussed
 
 
 [9]
 Neither in Ungar nor in this case are we faced with the situation in which the existence of a tie-in is attempted to be shown by a uniform writing extrinsic to the agreement
 
 
 [10]
 See note 11, infra
 
 
 [11]
 One case, Hehir v. Shell Oil, 72 F.R.D. 18 (D.Mass.1976), reached a contrary result on what appear to be identical facts. The court did not explain why it regarded coercion as a required element of proof, however, and the case, therefore, does not persuade us
 
 
 [12]
 It follows from the foregoing discussion that if class certification is granted, plaintiffs will be precluded from introducing evidence of threats of termination to prove the existence of a tie-in. Ungar, supra. Similarly, plaintiffs could not prove that they were precluded from installing tanks and pumps by the clause requiring the lessors' approval of leasehold alterations if proof that such approval would be withheld depended on specific instances of the clause being exercised in that manner
 
 
 [13]
 If plaintiffs had direct evidence of conspiracy, it would be unnecessary to prove that each defendant actually imposed the tie-in upon its lessees, only that each agreed to do so. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224-226 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)