**SHARON STEEL CORPORATION,**
Plaintiff,

v.

**The CHASE MANHATTAN BANK, N. A., Manufacturers Hanover Trust Company, and United States Trust Company of New York, Defendants.**

**MANUFACTURERS HANOVER TRUST COMPANY, Third–Party Plaintiff,**

v.

**UV INDUSTRIES, INC., Third–Party Defendant.**

**CONNECTICUT MUTUAL LIFE INSURANCE COMPANY, et al., Intervenors,**

v.

**SHARON STEEL CORPORATION,**
Plaintiff,

**and**

**UV INDUSTRIES, INC., Third–Party Defendant.**

**No. 79 Civ. 6996 (HFW).**

United States District Court,
S. D. New York.

Sept. 3, 1980.

Shearman & Sterling, New York City, for Sharon; W. Foster Wollen, Stephen A. Oxman, New York City, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Chase; Robert C. Myers, John F. Collins, Deborah B. Zwany, New York City, of counsel.

Kelley, Drye & Warren, New York City, for Manufacturers; Edward Roberts, III, William A. Krohley, Paul Lubetkin, New York City, of counsel.

Carter, Ledyard & Milburn, New York City, for U. S. Trust; Bernard Cedarbaum, Louis L. Stanton, Jr., New York City, of counsel.

Shea & Gould, New York City, for UV; Bruce A. Hecker, Ronald H. Alenstein, Jeffrey H. Squire, New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for Intervenors;

Frank H. Wohl, Nadia C. Adler, Donald M. Spector, Lee A. Barkan, New York City, of counsel.

## OPINION

WERKER, District Judge.

This action was commenced by plaintiff Sharon Steel Corporation ("Sharon") against defendants The Chase Manhattan Bank, N.A. ("Chase"), Manufacturers Hanover Trust Company ("Manufacturers"), and United States Trust Company of New York ("U.S. Trust"). Manufacturers impleaded UV Industries ("UV") as a third–party defendant, and the holders of certain UV debentures (the "Intervenors") intervened by asserting claims against Sharon and UV. Chase and U.S. Trust presently moved to dismiss the amended complaint for failure to state a claim upon which relief can be granted and for failure to join an indispensable party. Fed.R.Civ.P. 12(b)(6), (7). Manufacturers moves for summary judgment against Sharon and UV on its claims set forth in its amended third–party complaint and on its counter–claims set forth in its answer to the amended complaint. The Intervenors moved for class certification of the claims set forth in their amended complaint, for summary judgment on those claims, and for dismissal of Sharon's counterclaims.

## FACTS

For purposes of these motions, the facts as alleged by Sharon have been taken as being true,[1] and all reasonable inferences have been drawn in favor of Sharon and UV to the extent possible.

Between 1965 and 1977, UV borrowed certain sums of money pursuant to four separate indentures (the "Indentures"). The first two Indentures involved Chase as trustee, and the third and fourth involved Manufacturers and U.S. Trust, respectively, as trustees. The total principal amount borrowed under the Indentures was $114,408,900. Each of the Indentures provides that in the event UV merges or consolidates with any other corporation or sells "all or substantially all" of its assets to any other corporation, the successor corporation is entitled to succeed to UV's rights and obligations under the indentures. The Indentures further provide that additions, amendments and supplements are to be made by way of supplemental indentures that conform to the Trust Indenture Act of 1939.

On December 18, 1978, UV's Board of Directors (the "Board") announced that it had agreed to sell UV's wholly–owned subsidiary, Federal Pacific Electric Company ("Federal"), and that it was considering a plan of liquidation. In January 1979, the Board announced that it had approved a liquidation plan. On February 20, 1979, UV distributed a proxy statement to all of UV's stockholders recommending approval of the sale of Federal to a subsidiary of Reliance Electric Company ("Reliance") for $345,000,000. The proxy statement set forth and recommended a Plan of Liquidation and Dissolution (the "Liquidation Plan"), pursuant to which the assets of UV were to be sold over a 12–month period, with the proceeds or unsold assets to be distributed to shareholders after payment of or provision for UV's obligations. The Liquidation Plan required "that at all times there be retained an amount of cash and other assets which the Board deems necessary to pay, or provide for the payment of, all of the liabilities, claims and other obligations . . ." of UV. The proxy statement explained that the Liquidation Plan would enable UV to avoid having to pay $42,000,000 in federal income tax that it otherwise would have to pay for income derived from the sale of Federal. In order to qualify for the tax advantage, however, UV was required to complete its liquidation within 12 months. The proxy statement provided that if both the sale of Federal and the Liquidation Plan were approved, there would be an initial liquidating distribution of $18 per share to UV's common stockholders.

---

1. The recitation of facts that follows in the text is drawn principally from the sworn affidavits of Edwin Jacobson and Robert C. Griffin, the president of UV and vice–president of Sharon, respectively.

At a special stockholders' meeting held on March 26, 1979, UV's stockholders approved both the sale of Federal and the adoption of the Liquidation Plan. Sharon alleges that neither the trustees nor any of the Intervenors objected to the adoption of the Liquidation Plan. On March 29, 1979, the sale of Federal to Reliance for $345,000,000 in cash was consummated, again without objection from the trustees or any of the Intervenors.

In early 1979, Chase inquired as to UV's plans with respect to the Indentures, but it did not raise any objections. On April 20, 1979, Jacobson advised Chase that the Liquidation Plan had been adopted, that UV had sold Federal, and that UV would honor its commitments under the Indentures. The trustees were aware of the planned $18 per share distribution at least as early as February 20, 1979; yet, they raised no objection until the afternoon of April 26, 1979, the eve of the last business day before the distribution was to take place on Monday, April 30th. The trustees jointly called a meeting with UV representatives for April 26th. Each of the banks was represented at the meeting, and the banks demanded immediate payment of the amounts due under the Indentures plus accrued interest and prepayment premiums, if any, or the creation of a special fund to secure the indebtedness. They threatened to immediately seek to block the planned distribution unless UV agreed to their demands.

The banks refused to deal with UV individually, and insisted upon resolving the matter at that meeting. The meeting did not conclude until Friday morning. Believing that he had no other reasonable alternative, Jacobson signed a document entitled "Agreement for Treatment of Certain Obligations of UV Industries, Inc." (the "April Agreement"). The April Agreement required UV to deposit with certain banks on April 30, 1979 an aggregate amount of $155,000,000 in cash or cash equivalents and to maintain these accounts as specifically provided. The April Agreement also provided that in the event UV abandoned its Liquidation Plan, the April Agreement itself could be terminated as long as UV was not in default under any of the Indentures.

Affid. of Charles F. Ruge, sworn to Feb. 7, 1980, exh. K., at 7.

On April 30, 1979, UV deposited $155,000,000 into specially designated accounts. It made the $18 per share distribution to its common shareholders the same day, distributing a total of $274,000,000.

In October 1979, UV sold portions of various oil and gas properties to Tenneco Oil Company ("Tenneco") for $135,000,000 in cash and certain royalty rights.

In November 1979, Sharon became interested in offering and did offer to buy UV's assets and to assume UV's liabilities. UV accepted Sharon's offer, and an Agreement for Purchase of Assets (the "Purchase Agreement") and an Instrument of Assumption of Liabilities (the "Assumption Instrument") were entered into on November 26, 1979 and became effective on December 6, 1979.

Under the Purchase Agreement, all of the assets owned by UV on November 26, 1979 were purchased by Sharon. Under the Assumption Instrument, Sharon assumed all of UV's liabilities, with exceptions not relevant here, including UV's liabilities under the Indentures.

In accordance with the sections of the Indentures providing for the execution and delivery to the defendant trustees of supplemental indentures upon the sale of all or substantially all of UV's assets to another corporation, on December 6, 1979 Sharon delivered to each of the trustees a First Supplemental Indenture executed by Sharon and UV, along with other documents required by the Indentures. The defendants have refused to execute the supplemental indentures, but Sharon has nevertheless continued to make all payments of principal and interest required under the Indentures.

In December 1979, each of the trustees delivered to Sharon and UV virtually identical notices, all dated December 24, 1979, asserting that UV's sale of assets to Sharon constituted a default under the Indentures. None of the four notices referred to any event other than the sale of UV's assets to

Sharon as a basis for default. Affid. of Robert C. Griffin, sworn to April 30, 1980, exh. O. Chase and U.S. Trust simultaneously served virtually identical complaints on Sharon and UV, commencing actions in New York Supreme Court. Manufacturers subsequently filed an action against Sharon and UV in New York Supreme Court on March 21, 1980.

Sharon has notified each of the defendants that it wishes to withdraw the $155,000,000 deposited pursuant to the April Agreement, but the defendants have refused to permit any such withdrawals. Sharon filed its complaint in this Court in December 1979, and thereafter served an amended complaint.

The amended complaint sets forth nine causes of action. The first four claims are asserted against all the defendants and seek a declaration that the April Agreement is void. The fifth through eighth claims involve the four Indentures and the defendants individually as they relate to each Indenture. The ninth claim is asserted against all of the defendants and alleges violations of section 1 of the Sherman Act, 15 U.S.C. § 1. Subject matter jurisdiction over the ninth claim is asserted under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and over the first eight claims under the diversity of citizenship statute, 28 U.S.C. § 1332(a), and principles of pendent jurisdiction.

## DISCUSSION

### A. *The Antitrust Claim*

 Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." In a civil suit for damages, a plaintiff must allege and prove that two or more parties have entered into a contract, combination or conspiracy that unreasonably restrains interstate or foreign commerce, resulting in injury to his business or property. 15 U.S.C. §§ 1, 15. *See generally Northern Pacific Railway Co. v. United States*, 356

U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). It is clear that the amended complaint in this action alleges all of these elements.

The ninth claim of the amended complaint charges that the defendants agreed to and did act in concert to restrain interstate trade and commerce in the provision of credit. In particular, the amended complaint alleges *inter alia* that the defendants acting in concert agreed to and did refuse to deal individually with UV in order to coerce UV into signing the April Agreement for the ultimate purpose of improving the terms and conditions of the loan arrangements. The plaintiff further contends that it has been injured as a result of these actions in that its ability to utilize the credit for which its predecessor UV had bargained has been destroyed, that it has been deprived of the use and possession of approximately $155,000,000, and that consequently the overall value of its business has been substantially impaired. Hence, the amended complaint certainly alleges a contract, combination or conspiracy involving two or more entities and resultant injury to the plaintiff's business or property. The only question is whether the amended complaint alleges an unreasonable restraint of interstate trade or commerce.

The defendants allegedly refused to deal individually with UV and allegedly insisted on joint negotiations in order to enhance their bargaining power. This purported concerted refusal to deal separately was akin to a group boycott, and may indeed constitute an unreasonable restraint of trade under the Sherman Act. The Supreme Court has recently observed that "[t]his Court . . . has held unlawful concerted refusals to deal in cases where the target is a customer of some or all of the conspirators who is being denied access to a desired good or service because of a refusal to accede to particular terms set by some or all of the sellers." *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 543, 98 S.Ct. 2923, 2931, 57 L.Ed.2d 932 (1978). The situation alleged by Sharon is one where a "customer" of sorts is denied access to continued favorable credit terms

by virtue of the defendants' refusal to negotiate separately until it acceded to their demands.

The amended complaint also charges a horizontal price–fixing agreement among the defendants. Such agreements have been held to be *per se* unreasonable restraints of trade. *United States v. Socony– Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). The amended complaint alleges that the defendants agreed among themselves that the price UV was paying for credit under the Indentures was too low and that they consequently agreed to and did take steps to improve the terms and conditions of the Indentures. If the defendants did indeed enter into a combination for the purpose of tampering with prices, they may very well have violated section 1 of the Sherman Act.

The amended complaint states a cause of action on which relief may be granted. The motions to dismiss and for summary judgment are denied insofar as they seek dismissal of the anti–trust cause of action.

In view of the Court's ruling on the viability of the anti–trust cause of action, the defendants' assertion that UV is an indispensable party whose inclusion in the primary action would oust this Court of subject matter jurisdiction is rendered moot and need not be reached, since the remaining causes of action can be considered under the doctrine of pendent jurisdiction.

### B. The Indentures

The fifth through eighth claims of the amended complaint primarily involve the interpretation of the language in the Indentures that permits assumption of UV's obligations by a corporation that purchases all or substantially all the property of UV. The defendants, in moving to dismiss, and the Intervenors, in moving for summary judgment, contend that this language can only be construed to mean all or substantially all of the assets owned by UV at the time liquidation commenced, March 26, 1979. Sharon argues, on the other hand, that the relevant date is November 26, 1979, the date it in fact purchased all of UV's assets that were then in existence.

▉ Sharon has in my opinion clearly stated causes of action as to these four claims, and, moreover, has raised genuine questions of fact as to the meaning of the disputed language of the Indentures and the intent of the parties at the time the Indentures were executed. The provisions of the Indentures are not "wholly unambiguous"; Sharon therefore has a right to "present oral testimony or other extrinsic evidence at trial to aid in interpreting" those provisions. *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975). Accordingly, the motions to dismiss and for summary judgment must be denied as to the fifth through eighth claims of the amended complaint.

### C. The April Agreement

The first four claims of the amended complaint seek a declaration that the April Agreement is null and void and unenforceable on the grounds that UV was coerced into executing it, that it was an improper and unauthorized attempt to amend and supplement the Indentures, that it is unenforceable for lack of consideration, and that even assuming it was once valid, it has expired and is no longer applicable by virtue of the fact Sharon has purchased all or substantially all of UV's assets. Chase and U.S. Trust contend in this regard that the complaint fails to state a claim upon which relief can be granted, and Manufacturers seeks summary judgment.

▉ It is clear that the amended complaint does state claims upon which relief can be granted as to these causes of action, and that genuine issues of fact exist which preclude a grant of summary judgment. For example, although it may be true that threatening to exercise a legal right does not generally constitute coercion or duress, such action may constitute coercion or duress if the threat is made primarily to coerce someone into doing something he otherwise would not do. *See United States v. Bedford Associates*, 491 F.Supp. 851, 865 (S.D.N.Y.1980). The amended complaint in this action certainly alleges facts to support

a claim of economic coercion; it alleges that UV involuntarily accepted the terms of the April Agreement because it had no other reasonable alternative under the circumstances created by the defendants' coercive acts. Additionally, if the defendants' threatened lawsuit was based on invalid claims made in bad faith, then their forbearance from suit was not good consideration and the April Agreement would be unenforceable. *See* J. Calamari & J. Perillo, *Law of Contracts* § 4–6, at 143–45 (2d ed. 1977). Moreover, genuine issues of fact exist at to whether the defendants' actions amounted to coercion, as to whether UV made adequate provision for the payment of all of its obligations prior to commencing its liquidation, as to the intent of the parties as to the meaning of certain provisions of the Indentures concerning amendments and supplements, as to whether the defendants' claims underlying their threatened lawsuit were valid or reasonable and made in good faith, and as to the intent of the parties as to the meaning of certain provisions of the April Agreement, assuming it was a valid contract. For all of these and other reasons, the motions to dismiss and for summary judgment must be denied as to the first four claims of the amended complaint.

### D. *The Class Certification Motion*

The Intervenors seek a determination that this action is maintainable as a class action pursuant to Fed.R.Civ.P. 23.

 The proposed class of 87 holders of UV debentures is sufficiently numerous to make joinder of all class members impracticable. There are questions of law and fact common to all members of the class, and the named Intervenors have claims that are typical to the claims of the class. The Intervenors are represented by experienced and competent counsel who will undoubtedly "fairly and adequately protect the interests of the class." Hence, the prerequisites of subdivision (a) of Rule 23 to the maintenance of a class action have been met.

The Intervenors seek class certification under subdivision (b)(2) of Rule 23, which

provides that an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." Sharon and UV have indeed refused to redeem the debentures on the basis of grounds generally applicable to the class, and final injunctive or declaratory relief would be appropriate as to the class as a whole. Accordingly, class treatment under Rule 23(b)(2) is appropriate.

### CONCLUSION

In accordance with the above, the motions to dismiss and for summary judgment are denied. The Intervenors' motion for class certification is granted; the attorneys for the Intervenors are directed to submit a proposed class order on notice within 20 days after the entry of this decision.

SO ORDERED.