**In re BEXAR COUNTY HEALTH FACIL-
ITY DEVELOPMENT CORPORATION
SECURITIES LITIGATION.**

MDL No. 768.

United States District Court,
E.D. Pennsylvania.

May 31, 1989.

MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court is plaintiff's motion for class certification pursuant to Fed.R.Civ.P. 23(a) and (b)(3). For the reasons stated herein, plaintiff's motion is *granted* in part, and *denied* in part.

## I. BACKGROUND

Plaintiff brings this action for damages and injunctive relief for alleged fraud arising out of the sale of the Bexar County Health Facilities Development Corporation First Mortgage Revenue Bonds (Trinity Retirement Living Foundation Project) Series 1984 (hereinafter the "Trinity bonds" or

the "bonds"). Plaintiff seeks certification of a class consisting of:

All persons who were original purchasers of the Bexar County Health Facilities Development Corporation First Mortgage Revenue Bonds (Trinity Retirement Living Foundation Project) Series 1984, excluding only the defendants.

Twenty-seven million dollars ($27,000,000) worth of principal was issued to between 1,000 and 2,000 purchasers with minimum purchases of five thousand dollars ($5,000).

The bonds were issued by the Bexar County Health Facilities Development Corporation, a Texas corporation, pursuant to an Official Offering Statement dated November 14, 1984. Proceeds from the sale of the bonds were loaned to the Trinity Retirement Living Foundation, a non-profit Texas corporation, to finance construction of a 162 unit residential retirement community and 75 unit nursing home facility named The Village on the Heights. The Offering Statement was published and distributed by the underwriter of the bonds, defendant Miller & Schroeder Financial Inc., a subsidiary of Miller & Schroeder, Inc., (hereinafter "Miller & Schroeder") in conjunction with their attorneys defendant Kutak, Rock & Campbell. The contractor and developer on the project was Ameri-Care Corporation.

Under the Indenture of Trust accompanying the offering, the bondholders were limited to the assets of Trinity Foundation and, hence, the revenues generated from the sale of residential units and operation of the nursing care facility, for payment of principal and interest on the bonds. Consequently, a Financial Feasibility Study for The Village on the Heights was prepared by the accounting firm of defendant Laventhol & Horwath and was included in the Official Offering Statement. In its Financial Feasibility Study, Laventhol & Horwath concluded that the financial projections for The Village on the Heights were reasonable and adequate to support timely payment of principal and interest on the Trinity bonds. The bonds, in fact, have been in default since December of 1986 and the Trinity Foundation has filed a petition under Chapter 11 of the United States Bankruptcy Code.

Plaintiff claims that the Official Offering Statement and Financial Feasibility Study contain material misrepresentations and omissions in that they fail to properly disclose the true financial condition of two identical Texas facilities called Canyon Creek and Rolling Meadows. These projects had likewise been developed by AmeriCare Corporation and financed by revenue bonds issued through an offering statement distributed by Miller & Schroeder and Kutak, Rock & Campbell. In addition, a financial feasibility study was prepared by Laventhol & Horwath for the Rolling Meadows project.[1] At the time of the Trinity offering, occupancy rates, and thus revenues, from Canyon Creek and Rolling Meadows had fallen substantially behind the estimates set forth in their offering statements and both ventures are either in default, or are in danger of defaulting, on their bonds. Plaintiff's complaint alleges causes of action under: (1) § 10(b) of the Securities Exchange Act of 1934 ("the Securities Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder; (2) §§ 12(2) and 17(a) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77$l$(2) and § 77q(a); (3)

---

1. The Offering Statement disclosed the existence of the Canyon Creek and Rolling Meadows projects in a section discussing the developer AmeriCare Corporation. It stated, *inter alia:*

AmeriCare and AmeriCare Management have undertaken development, marketing and management obligation for two other retirement centers in addition to the Project. Both The Village on the Canyon Creek, in Temple, Texas, and Rolling Meadows, in Wichita Falls, Texas, are in the final stage of construction and had their first residents move in during the summer of 1984. As of November 13,

1984, of the 172 units in The Village on Canyon Creek, 51 (30%) of the units are currently occupied with residence contracts executed for an additional 36 (21%) units. As of November 13, 1984, of the 170 units in Rolling Meadows, 22 (13%) of the units are occupied and deposits have been received for an additional 57 (34%) units. Appendix 1 to Miller & Schroeder, Inc.'s Motion in Opposition to Class Certification, at 13. No mention of the projects were made in the Financial Feasibility Study.

the Blue Sky Laws of Minnesota, Illinois and Texas; and (4) state common law fraud, negligence and misrepresentation. Plaintiff, on behalf of the class of purchasers, seeks recision and damages for unpaid principal and interest totaling some thirty million dollars ($30,000,000).

## II. CLASS CERTIFICATION

■ Class action treatment of related claims is particularly appropriate and desirable when plaintiffs seek redress for alleged violations of the securities laws. It is well recognized that private enforcement of these laws is a necessary supplement to government regulation. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), *cert. denied sub nom. Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed. 2d 290 (1985); *Gavron v. Blinder Robinson & Co., Inc.,* 115 F.R.D. 318, 321 (E.D. Pa.1987). Accordingly, in an alleged securities fraud case, when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward. *Eisenberg, supra,* 766 F.2d at 785. However, courts may approve class actions only after a "rigorous analysis" ensuring compliance with Fed.R.Civ.P. 23. *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

When seeking class certification, plaintiff bears the burden of proving that the action satisfies all four threshold requirements set forth in Fed.R.Civ.P. 23(a), and also falls within one of the categories of Rule 23(b). *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 2145, 40 L.Ed. 2d 732 (1974). Rule 23(a) provides:

(a) *Prerequisites to a Class Action.*

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). A plaintiff relying on Rule 23(b)(3) must meet two additional criteria: (1) questions of law or fact common to class members must predominate over any questions affecting individual members; and (2) the class action device must be superior to any other method of adjudication. Fed.R.Civ.P. 23(b)(3).

### A. Section 10(b) of the Securities Exchange Act

#### 1. *Numerosity*

■ Rule 23(a)(1) permits class action treatment only when "the class is so numerous that joinder of all class members is impracticable." Fed.R.Civ.P. 23(a)(1). No magic number exists satisfying the numerosity requirement, nor must plaintiff allege the exact number or identity of class members. *Dirks v. Clayton Brokerage Co. of St. Louis, Inc.,* 105 F.R.D. 125, 131 (D.Minn.1985), *citing,* 7B F.C. Wright & A. Miller & M. Kane, *Federal Practice & Procedure* § 1762, at 562; *Zeffiro v. Pennsylvania Banking & Trust Co.,* 96 F.R.D. 567, 569 (E.D.Pa.1983). It is proper for the court "to accept common sense assumptions in order to support a finding of numerosity." *Wolgin v. Magic Marker Corp.,* 82 F.R.D. 168, 171 (E.D.Pa.1979).

■ The numerosity requirement is clearly satisfied in this case. Plaintiff estimates that there are between 1,000 and 2,000 original purchasers of the Trinity bonds. Although this number is not overwhelming in the context of 10b–5 litigation, the court finds joinder of this number sufficient to warrant class certification. *Zeffiro, supra,* 96 F.R.D. 567 (class of 51 satisfies numerosity in securities litigation); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 88 F.R.D. 38 (S.D.N.Y.1980) (class of 87 holders of debentures satisfies numerosity).

#### 2. *Commonality*

■ The commonality requirement of Rule 23(a)(2) has been applied permissively by courts in the context of securities fraud litigation. *Snider v. Upjohn Co.,* 115 F.R. D. 536, 539 (E.D.Pa.1987); *Peil v. National Semiconductor Corp.,* 86 F.R.D. 357, 367

(E.D.Pa.1980), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). Commonality is not defeated by slight differences in class members' positions or because "all of the allegations of the class do not fit together like pieces in a jigsaw puzzle." *Green v. Wolf Corp.,* 406 F.2d 291, 300 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). In ascertaining whether plaintiff satisfies Rule 23(a)(2), the court must refrain from considering the merits of the substantive claims. *Eisen, supra,* 417 U.S. at 177–78, 94 S.Ct. at 2152–53. The court is limited to verifying the existence of common questions of law or fact.

Plaintiff's allegations that the Trinity project's Official Offering Statement contained material misrepresentations and omitted material facts concerning the Canyon Creek and Rolling Meadows facilities is the paradigmatic common question of law or fact in a securities fraud class action. *See Cohen v. Uniroyal, Inc.,* 77 F.R.D. 685, 690 (E.D.Pa.1977). Section 10(b) of the Securities Exchange Act makes it unlawful for any person:

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. In response, the Commission promulgated Rule 10b–5 which makes it unlawful, subject to the interstate jurisdictional requirement, for any person:

> (a) to employ any device, scheme, or artifice to defraud,
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or
> (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon

any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Thus, in order to establish a prima facie case under Rule 10b–5, plaintiff must plead and prove (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiff reasonably relied, and (5) which was the proximate cause of the losses sustained. *See Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986); L. Loss, *Fundamentals of Securities Regulation,* at 955–59 (1988). At this juncture, it is sufficient to note that common questions include whether the Official Offering Statement contained misrepresentations or omitted facts, whether those misrepresentations or omissions were material, and whether defendants acted with the requisite degree of knowledge to violate § 10(b) and Rule 10b–5.

### 3. *Typicality*

The claims of the representative parties must be typical of the claims of the class. Fed.R.Civ.P. 23(a)(3). The typicality requirement is a safeguard against interclass conflicts, insuring that the named plaintiff's interests are more or less coextensive with those of the class. *Sley v. Jamaica Water & Utilities, Inc.,* 77 F.R.D. 391, 394 (E.D.Pa.1977). In this respect, the typicality requirement overlaps with the Rule 23(a)(4) requirement since it ensures that absent class members will be adequately represented.

The typicality requirement is met if the plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory. *Zeffiro, supra,* 96 F.R.D. 567. As this court has stated:

> The heart of this requirement is that plaintiff and each member of the represented group have an interest in prevailing on similar legal claims. Assuming such an interest, particular factual differences, differences in the amount of damages claimed, or even the availability of certain defenses against a class repre-

sentative may not render his or her claims atypical.

*Id.* at 569–70. *See also Snider, supra,* 115 F.R.D. at 540. H. Newberg, *Newberg on Class Actions* § 1115(b) (1985).

Furthermore, the United States Court of Appeals for the Third Circuit has observed that "typical" does not mean "identical". Thus, the focus of the typicality requirement entails an inquiry into whether the plaintiff's individual circumstances are markedly different or whether the legal theory upon which the claims are based differs from that upon which the claims of the other class members will be based. *Eisenberg, supra,* 766 F.2d at 786.

■ As previously noted, plaintiff's complaint avers that the Official Offering Statement for the Trinity bonds was fraudulent because the Financial Feasibility Study failed to disclose that revenues from the Canyon Creek and Rolling Meadows projects were significantly behind the estimates set forth in their offering statements. Plaintiff's claims can therefore essentially be characterized as based on fraudulent omissions. In *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) the Supreme Court held that, in a case "involving primarily a failure to disclose", a plaintiff will be entitled to a rebuttable presumption of reliance. *Id.* at 153–54, 92 S.Ct. at 1472. Furthermore, the fact that misrepresentations are also involved does not alter this presumption. *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 188–89 (3d Cir.1981). Instead, defendants must show that plaintiff did not, in fact, rely on the allegedly fraudulent offering statement. Once plaintiff is entitled to this presumption, lack of reliance becomes an affirmative defense to be proven by defendant. *Snider, supra,* 115 F.R.D. at 546.

■ Defendants contend that typicality is defeated in this case since deposition testimony of plaintiff reveals that he did not read or receive the Official Offering Statement prior to the purchase of his one $5,000 Trinity bond and therefore could not have relied upon any alleged misrepresentations or omissions contained therein.

Plaintiff admittedly purchased his bond from his brokerage house, I.M. Simon & Co. (hereinafter "Simon"), after a telephone conversation with his broker at Simon, and upon receipt of a one-page flier apparently prepared by Simon. *See* Deposition of Edward J. Whalen Appendix 2 to Miller & Schroeder Inc.'s Motion in Opposition to Class Certification. The flier contained a brief description of The Village on the Heights and basic information on the bond's maturity, yield and redemption provisions. *See* Exhibit B to Plaintiff's Reply Memorandum in Support of Class Certification. This information was derived directly from the Offering Statement and merely transmitted objective facts concerning debt service on the bonds. Thus, plaintiff argues that he did rely indirectly on information contained in the Offering Statement. *See Green v. Wolf Corp.* 406 F.2d 291 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *In re Texas International Securities Litigation,* 114 F.R.D. 33 (W.D.Okl.1987).

Plaintiff also testified that he received and read the Offering Statement soon after his purchase with the expectation that he could rescind the transaction if information in the Statement materially altered the facts set forth in the flier. Although plaintiff's unilateral expectations cannot create reliance as a matter of law, the court believes that plaintiff's method of reliance is sufficiently typical for purposes of class certification. *See Snider, supra,* 115 F.R. D. at 540. Indeed, plaintiff's method of reliance, a purchase of bonds through his individual broker, is clearly typical of most private securities transactions and nothing in the record indicates the Trinity offering was to the contrary. *See In re Data Access Systems Securities Litigation,* 103 F.R.D. 130, 139 (D.N.J.1984), *rev'd on other grounds,* 843 F.2d 1537 (3d Cir.1988); *Klein v. A.G. Becker Paribas, Inc.,* [1985–86 Transfer Binder] Fed.Sec.L.Rep. CCH ¶ 92, 559 (S.D.N.Y.1986). The existence of material differences between the flier and the Offering Statement which are sufficient to break the chain of causation by negating reliance entirely is a matter bet-

ter left to later stages of this litigation. The court therefore finds that plaintiff is entitled to the *Affiliated Ute* presumption of reliance for purposes of class certification.

■ Additionally, count II of plaintiff's complaint alleges that defendants conspired to bring the Trinity bonds onto the market through a series of fraudulent misrepresentations and material omissions in that the bonds could not have been marketed had the true financial status of the Canyon Creek and Rolling Meadows facilities been disclosed. Plaintiff contends that he, and members of the class, relied on the integrity of the market in purchasing the bonds, thereby creating a rebuttable presumption of reliance under Rule 10b–5. This is a derivation of the nascent "fraud on the market" theory, which has been expressly upheld by both the United States Supreme Court, *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), and the Third Circuit, *Peil v. Speiser,* 806 F.2d 1154 (3d Cir.1986).

In language adopted by the Supreme Court in *Levinson,* the Third Circuit in *Peil v. Speiser* defined the fraud on the market theory as:

> [B]ased on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available information regarding the company and its business ... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the mistatements ... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Peil, supra,* 806 F.2d at 1160–61, *quoted in, Levinson, supra,* 108 S.Ct. at 988–89. *See also* Note, *The Fraud on the Market Theory: Efficient Markets and the Defenses to an Implied 10b–5 Action* 70 Iowa L.Rev. 975 (1985). The Third Circuit has found that fraud on the market creates a threefold presumption. First, the court presumes that the misrepresentation affected the market price. Second, it presumes that a purchaser did in fact rely on the price of the stock as an indication of its value. Third, it presumes the reasonableness of that reliance. *Zlotnick v. TIE Communications,* 836 F.2d 818, 822 (3d Cir.1988). A defendant may rebut this presumption by showing that the price was unaffected by the fraud or that plaintiff would have made the purchase regardless of the undisclosed information. *Id.*

Defendants argue that the fraud on the market presumption does not apply in this case since mortgage revenue bonds are not traded on an open and developed market where information is directly reflected in the price of the security. *See, e.g., Zlotnick, supra,* 836 F.2d 818 (fraud on the market presumption does not apply to short sales); *Stinson v. Van Valley Development Corp.,* 714 F.Supp. 132 (E.D.Pa. 1989) (fraud on the market theory does not apply to undeveloped markets); *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989) (fraud on the market presumption applies to over the counter stocks only when a developed market in that stock can be proven). *See also* Black, *Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions* 62 N.C.L.Rev. 435 (1984). Rather, the principal amount of the Trinity bonds was fixed and the only market factor affecting the bond price at initial sale was the interest rate. Moreover, no public exchange exists for the initial offering of municipal bonds and sale therefore involves a great deal of personal contact with private brokers and investment advisers.

Although the decisions in *Basic, Inc. v. Levinson* and *Peil v. Speiser* were limited to shares traded on an efficient and open exchange such as the corporate equity markets, numerous courts have extended this rationale to establish a "fraud created the market" theory for privately traded or newly issued securities. *See, e.g., Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (*en banc*), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Arthur Young & Co. v. United States District*

*Court,* 549 F.2d 686 (9th Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977); *T.J. Raney & Sons, Inc. v. Fort Cobb Okl. Irrigation Fuel Auth.,* 717 F.2d 1330 (10th Cir.1983), *cert. denied sub nom. Linde v. T.J. Raney & Sons, Inc.,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *Goldwater v. Alston & Bird,* 116 F.R.D. 342 (S.D.Ill.1987); *Ross v. BankSouth, N.A.,* 1986 Fed.Sec.L.Rep. CCH ¶ 92,526 (N.D.Ala.1986); *Greenwald v. Integrated Energy, Inc.,* 102 F.R.D. 65 (S.D.Tx.1984); *Masri v. Wakefield,* 106 F.R.D. 322 (D.Colo.1984); *Rose v. Ark. Val. Envirn. & Utility Auth.,* 562 F.Supp. 1180 (W.D.Mo. 1983); *Frankel v. Wyllie & Thornhill, Inc.,* 537 F.Supp. 730 (W.D.Va.1982). *But see Abell v. Potomac Insurance Co.,* 858 F.2d 1104 (5th Cir.1988); *Vervaecke v. Chiles, Heider & Co.,* 578 F.2d 713 (8th Cir. 1978); *Desfor v. National Housing Ministries,* No. 86–1562 slip op., 1986 WL 12031 (E.D.Pa.1986); *Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241 (S.D.N.Y. 1984).

As described by the court in *Anderson v. Bank of the South, N.A.,* 118 F.R.D. 136 (M.D.Fla.1987), a case adopting the fraud on the market theory on facts virtually identical to those at bar, under the fraud created the market theory "the reliance and causation-in-fact elements are established by showing that 'the scheme was intended to and did bring the Bonds onto the market fraudulently and ... [plaintiff] relied on the integrity of the securities market.'" 118 F.R.D. at 144, *quoting, Shores v. Sklar,* 647 F.2d at 469. Defendants note that in *Abell, supra,* 858 F.2d 1104, the Fifth Circuit took a narrow view of its prior decision in *Shores v. Sklar* and limited the fraud created the market presumption to instances where "the promoters knew the enterprise itself was patently worthless." *Id.* at 1122. The court in *Abell,* however, was addressing this issue with the benefit of a complete factual record.[2] To do so here would certainly violate the admonition that courts should not delve excessively into the merits when determining whether class certification is appropriate. *Eisen, supra,* 417 U.S. at 177–78, 94 S.Ct. at 2152–53.

Recognizing that this rationale under Rule 10b–5(2) could potentially read the reliance requirement out of the securities laws, courts have limited the fraud created the market presumption to complaints alleging violations under 10b–5(1) or (3). *Shores v. Sklar, supra,* 647 F.2d at 470–71. The court's decision is thus a narrow one. It holds that the allegations of fraud set forth in plaintiff's complaint are sufficient to invoke the fraud created the market presumption of reliance for purposes of class certification under Rule 10b–5(1) or (3). The court finds this holding consistent with the Congressional intent to make full disclosure the primary objective of the securities laws. *See Santa Fe Ind., Inc. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). Given the alternative presumption created by *Affiliated Ute,* the court will certify plaintiff's complaint under all three sections of Rule 10b–5. On the present record, the court does not believe that defendants have sufficiently rebutted these presumptions to defeat class certification. However, this ruling may be revisited at an appropriate time in this litigation.

### 4. *Adequacy*

In considering plaintiff's adequacy as a class representative the Third Circuit has held that the requirement entails: (1) the qualification and competence of plaintiff's attorney, and (2) whether plaintiff's interests are antagonistic to those of the class. *Weiss v. York Hosp.,* 745 F.2d 786, 811 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Defendants do not question the competency of plaintiff's counsel. Instead, they contend that the atypicality of plaintiff's claim makes his interests antagonistic to those of the class. The court's resolution of the

---

**2.** The Fifth Circuit in *Abell* granted in part plaintiff's motion for judgment notwithstanding the verdict after a full jury trial on the merits.

typicality requirement also resolves this issue.

### 5. *Predominance and Superiority*

■ Plaintiff's claim must also satisfy the Rule 23(b)(3) predominance requirement. The only individual questions involve issues of reliance and damages. Their importance fails to outweigh the common questions of whether defendants made materially misleading statements or failed to disclose material information concerning the financial projections for the Trinity project. In determining whether common questions predominate, the court's inquiry is directed primarily toward the issue of liability. *Bogosian, supra,* 561 F.2d at 456. The common questions and their predominance over individual claims are exemplified by the fact that if plaintiff and every class member were to bring an individual action, they would still be required to show the omissions or misleading statements in order to prove liability.

In this case the class action device is superior to other methods of adjudication. Joinder of all of the class members would be impracticable and duplicative individual trials would impose similar burdens on the litigants and the court. The utility and the necessity of presenting the claims asserted in this action through the class action method is great since "a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf." *Green v. Wolf Corp., supra,* 406 F.2d at 296.

Having satisfied all the requirements of Fed.R.Civ.P. 23, plaintiff's motion for class certification under § 10(b) of the Securities Exchange Act will be granted.

### B. Section 12(2) of the Securities Act

■ Count III of plaintiff's complaint alleges that defendants violated § 12(2) of the Securities Act, which provides that any person who:

[O]ffers or sells a security (whether or not exempted by the provisions of Section 3, other than paragraph 2 of subsection (a) thereof), ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of such untruth or omission, ... shall be liable to the person purchasing such security from him....

15 U.S.C. § 77*l*(2). Section 12(2) therefore dispenses with Rule 10b–5's requirements of scienter and reliance, *Sanders v. John Nuveen & Co., Inc.,* 619 F.2d 1222 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981), and, unlike §§ 11 and 12(1) of the Securities Act, extends to representations unrelated to registration materials.[3] *See* Loss, *supra,* at 887–96. Defendants, however, claim that the two limiting provisions of § 12(2), namely its exemption of securities under § 3(a)(2) and its privity requirement, make it unsuited for class certification in this case.

■ The § 3(a)(2) exemption of the Securities Act extends to:

Any security issued or guaranteed by the United States or any territory thereof, or by the District of Columbia, or by any state of the United States, *or by any political subdivision of a state or territory, or by any public instrumentality of one or more states or territories,* or by any person controlled or supervised by and acting as an instrumentality of the government of the United States pursuant to authority granted by the Congress of the United States.....

---

**3.** Section 11 of the Securities Act, 15 U.S.C. § 77k, imposes liability for filing a materially false registration statement. Section 12(1), 15 U.S.C. § 77*l*(1), creates strict liability against a

seller of an unregistered security not exempt from the registration provisions of § 5, 15 U.S.C. § 77e.

15 U.S.C. § 77c(a)(2) (emphasis added). Despite the fact that the Trinity bonds were issued by the Bexar County Health Facilities Development Corporation, a political subdivision of the state of Texas, plaintiff claims that the § 3(a)(2) exemption does not apply. The basis for this contention is that the Trinity bonds represent a method of "conduit financing" subject to the "separate security" provision of SEC Rule 131, which states:

> Any part of an obligation evidenced by any bond, note, debenture, or other evidence of indebtedness issued by any governmental unit specified in Section 3(a)(2) of the Act which is payable from the payments to be made in respect of property or money which is or will be used, under a lease, sale or loan arrangement, by or for industrial or commercial enterprise, shall be deemed to be a separate "security" within the meaning of Section 2(1) of the Act, issued by the lessee or obligor under the lease, sale or loan arrangement.

17 C.F.R. § 230.131. Plaintiff thus alleges that the loan agreement between the Trinity Retirement Living Foundation and the Bexar County Health Facilities Development Corporation is a separate security under SEC Rule 131, thereby obviating the § 3(a)(2) exemption.

Defendants do not challenge the validity of SEC Rule 131 but argue that the Trinity Foundation, a non-profit corporation, is not an "industrial or commercial enterprise" as required by the Rule. In support of this argument, defendants cite *Gorsey v. I.M. Simon & Co.*, [1987 Transfer Binder] Fed. Sec.L.Rep. CCH ¶ 93,173 (D.Mass.) in which the United States District Court for the District of Massachussetts declined to apply SEC Rule 131 to an identical entity likewise determined to be a non-profit corporation under § 501(c)(3) of the Internal Revenue Code. Plaintiff's argue that *Gorsey* was wrongly decided and was contrary to the statutory intent of the Commission in adopting Rule 131. This court does not agree.

In the release proposing Rule 131, Securities Act Release No. 33–4896, [1967–69 Transfer Binder] Fed.Sec.L.Rep. CCH ¶ 77,525 (February 1, 1968), the Commission indicated that Rule 131 is directed at the "typical industrial revenue bond financing plan, [which] represents a financing plan by a private company through which amounts payable by the company whose projects are being financed flow to the bondholder" *Id.* However, Rule 131 is circumscribed by the provisions of § 3(a)(2). As noted by the court in *Gorsey*, "[t]he phrase 'industrial development bonds', as used in that statutory provision, is a technical one; it refers specifically to the definitions in the Internal Revenue Code, 26 U.S. C. § 103...." *Gorsey, supra,* ¶ 93,173, at 95,778. Plaintiff concedes that the loan agreement between the Trinity Foundation and Bexar County does not fit this statutory proscription. Moreover, since the court agrees with the court in *Gorsey* that "the phrase 'industrial or commercial enterprise' was intended by the SEC to have the same scope as the Internal Revenue Code definition of 'industrial development bonds'," the court finds Rule 131 inapplicable to the Trinity Foundation.

Although this method of conduit financing may, in some instances, result in a technical loophole through which a company may avoid the strictures of § 12, application of the § 3(a)(2) exemption to nonprofit corporations engaged in conduit financing serves the overall purpose of encouraging the work of non-profit organizations. The court is unwilling to strip nonprofit corporations of the benefit of this exemption without more express legislative guidance. Since the Trinity Living Retirement Foundation was determined to be a non-profit corporation under § 501(c)(3) of the Internal Revenue Code, it is not the private industrial or commercial enterprise contemplated by SEC Rule 131. The loan arrangement between the Bexar County Health Facilities Development Corporation and the Trinity Foundation is therefore not a separate security. *A fortiori,* the Trinity bonds are entitled to the § 3(a)(2) exemption from § 12(2). Plaintiff's motion for class certification under § 12(2) will consequently be denied.

Given the determination that the Trinity bonds are exempt from the requirements of § 12(2) of the Securities Act, the court elects not to address the privity requirement and the scope of aider and abettor liabilty under § 12.

C. Section 17(a) of the Securities Act

■ Plaintiff also seeks class certification under § 17(a) of the Securities Act, 15 U.S.C. § 77q(a). Although the elements of a cause of action under § 17(a) are virtually identical to those under Rule 10b-5[4], a major split among the circuits has developed as to whether an implied private right of action exists under § 17(a). Neither the Supreme Court nor the Third Circuit has addressed this issue directly. However, this court joins the clear majority of district courts within this circuit, beginning with Judge Giles decision in *Kimmel v. Peterson*, 565 F.Supp. 476 (E.D.Pa 1983), that have refused to imply a private right of action under § 17(a). *See, e.g., Metropolitan Int'l, Inc. v. Alco Standard Corp.*, 657 F.Supp. 627, 632–33 (M.D.Pa 1986); *Mursau Corp. v. Florida Penn Oil & Gas, Inc.*, 638 F.Supp. 259, 261 (W.D.Pa 1986), *aff'd*, 813 F.2d 398 (3d Cir.1987); *Ethanol Partners Accredited v. Wiener, Zuckerbrot, Weiss & Brecher*, 617 F.Supp. 300 (E.D.Pa.1985). *See also* Loss, *supra*, at 977–81.

In *Kimmel*, Judge Giles argued that cases implying a private right of action under the general antifraud provisions of § 17(a) merely followed similar decisions under § 10(b) of the Securities Exchange Act without independent analysis. Instead, the court applied the test set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed. 2d 26 (1975) to determine whether Con-

gress intended to imply a right of action beyond SEC enforcement.

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. at 2088. The *Kimmel* court found that an implied right of action under § 17(a) was contrary to the second and third prongs of the *Cort v. Ash* test.

Although this court finds the legislative history on § 17(a) to be inconclusive, an implied right of action under § 17(a) certainly violates the third prong of the *Cort* test. In oft-quoted language, Professor Loss has described the difficulty in implying a private right of action under § 17(a):

It is one thing to imply a private right of action under § 10(b) or the other provisions of the 1934 act, because the specific liabilities created by §§ 9(e) [market manipulation], 16(b) [short swing profits by insiders] and 18 [misleading statements in documents filed under 1934 Act] do not cover all the variegated activities with which the act is concerned. But it is quite another thing to add an implied remedy under § 17(a) of the 1933 act to the detailed remedies specifically created

---

**4.** Section 17(a) provides:

  (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of interstate commerce or by the use of the mails, directly or indirectly—

    (1) to employ any device, scheme, or artifice to defraud, or

    (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a). In *Aaron v. Securities and Exchange Comm'n*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) the Supreme Court held that the SEC need not prove scienter in an enforcement action under § 17(a)(2) or (3), although scienter is required under § 17(a)(1). This lack of a scienter requirement is the only appreciable difference between § 17(a) and Rule 10b-5.

by §§ 11 [false statements in registration materials] and 12 [seller liabilty for failure to register or for false statements or omissions]. The 1933 act is a much narrower statute. It deals only with disclosure and fraud *in the sale* of securities. It has but two important substantive provisions, §§ 5 and 17(a). Noncompliance with § 5 results in civil liability under § 12(1). Faulty compliance results in liability under § 11. And § 17(a) has its counterpart in § 12(2). It all makes a rather neat pattern. Within the area of §§ 5 and 17(a), §§ 11 and 12 (unlike §§ 9(e), 16(b) and 18 of the 1934 act) are all-embracing. This is not to say that the remedies afforded by §§ 11 and 12 are complete. But the very restrictions contained in those sections and the differences between them ... make it seem less justifiable to permit plaintiffs to circumvent the limitations of § 12 by resort to § 17(a).

Loss, *supra,* at 977–78 (emphasis in original). Simply put, an implied right of action under the sweeping antifraud provisions of § 17(a) renders nugatory the entire statutory scheme of the Securities Act and thus violates the third prong of the *Cort v. Ash* test.

Plaintiff claims that this reasoning is contrary to the Supreme Court's decision in *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). In *Herman & MacLean,* a unanimous Supreme Court held that an implied right of action exists under Rule 10b–5 for false statements in a registration statement despite the availability of an express remedy under § 11 of the Securities Act. The Court noted that "[w]hile some conduct actionable under § 11 may also be actionable under § 10(b), it is hardly a novel proposition that the 1934 Act and the 1933 Act 'prohibit some of the same conduct.'" 459 U.S. at 383, 103 S.Ct. at 688, *quoting, United States v. Naftalin,* 441 U.S. 768, 778, 99 S.Ct. 2077, 2084, 60 L.Ed. 2d 624 (1979).

The court, however, does not interpret this case as making the provisions of the 1933 and 1934 acts indistinguishable. As stated in *Kimmel,* the court is required to

conduct an independent analysis to determine whether Congress intended to create a private remedy under § 17(a). For the aforementioned reasons, the court holds that no such right exists and plaintiff's motion for class certification under this provision is accordingly denied.

### D. Plaintiff's Blue Sky and Common Law Claims

■ Since plaintiff depends on the fraud on the market theory to establish reliance in this case, there are special reasons why the pendent state law claims should not be certified for class action treatment. Fraud on the market, and the derivative fraud created the market, theories of reliance have not been developed in state courts, *Rosenberg v. Diglog,* [1985–86 Transfer Binder] Fed.Sec.L.Rep. CCH ¶ 92,274, at 91,895 (E.D.Pa.1985), and the Supreme Court has cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (footnote omitted). Claims involving theories novel to state law should, therefore, be left to state courts.

Plaintiff's common law claims are likewise not subject to the fraud created the market presumption and reliance would have to be directly proven in each case. Moreover, individual questions of state law regarding the elements of these various theories will certainly predominate. Consequently, plaintiff's motion for class certification of pendent state law claims will be denied.

## III. CONCLUSION

Because the court believes that plaintiff is entitled to the presumption of reliance under the *Affiliated Ute* doctrine and the fraud created the market theory, plaintiff's motion for class certification under § 10(b) of the Securities Exchange Act will be granted. Plaintiff's motion for class certification under §§ 12(2) and 17(a) of the

Securities Act will be denied for the reasons set forth above. Plaintiff's motion for class certification under the various state Blue Sky Laws and under the common law theories of fraud, negligence and misrepresentation will be denied since individual questions predominate.[5]

See also, D.C., 125 F.R.D. 646.

---

5. On April 12, 1988, the Judicial Panel on Multi-district Litigation transferred *Fahey v. Miller & Schroeder Financial, Inc., et al,* SA–87–CA–1438 to this court from the United States District Court for the Western District of Texas for consolidation of pretrial proceedings with *Whalen v. Miller & Schroeder, et al,* CA 87–7280, the case filed in the Eastern District of Pennsylvania. On September 21, 1988, *Meyer v. Miller &* *Schroeder Financial, Inc., et al,* was likewise transferred from the United States District Court for the District of South Dakota. This class certification memorandum and order therefore applies to all plaintiff's described in the class and includes all cases consolidated by the Panel. *See Manual for Complex Litigation* § 5.40 (1982).